George R. BIRKELUND, Charles E. Siddall, of Chicago, Illinois, and Kenyon T. Fay, of Los Angeles, California, Trustees of the Algoma Lumber Liquidation Trust, Successors in Interest of the Algoma Lumber Company, a Corporation,

v.

The UNITED STATES in a Fiduciary Capacity for the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians and Said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians.

No. 50450.

United States Court of Claims.

June 5, 1956.

William S. Bennet, New York City, for plaintiffs. Bennet, House & Couts, New York City, were on the briefs.

David D. Hochstein, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This case comes before the court pursuant to the provisions of the following special· jurisdictional act of January 3, 1951, 64 Stat., Part 2, p. A273:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, notwithstanding the provisions of section 2103 of the Revised Statutes (U.S.C., title 25, sec. 81) and notwithstanding any statute of limitations or lapse of time or any limitation upon the jurisdiction of the Court of Claims with respect to claims upon any contract implied in law, jurisdiction is hereby conferred upon such court to hear, determine, and render judgment upon the claim of the Algoma Lumber Company (including the claim of George R. Birkelund and Charles E. Siddall, of Chicago, Illinois, and Kenyon T. Fay, of Los Angeles, California, trustees of the Algoma Lumber*

Liquidation Trust, successors by transfer, conveyance, and assignment thereof) either against the United States in a fiduciary capacity for the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians or against said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians in connection with the contract construed by such court in its decision dated January 12, 1938, in the case of Algoma Lumber Company, a corporation, against the United States (Algoma Lumber Co. v. United States, 86 Ct.Cl. 226).

"Sec. 2. The amount of any judgment awarded by the Court of Claims upon such claim shall not exceed the amount of the judgment heretofore awarded by such court in the case of Algoma Lumber Company, a corporation, against the United States (86 Ct.Cl. 226, 271).

"Sec. 3. Suit upon such claim may be instituted by or on behalf of the Algoma Lumber Company or by the said trustees as successors in interest thereto at any time within one year after the date of enactment of this Act. Proceedings for the determination of such claim and review thereof shall be had as in the case of claims over which such court has jurisdiction under section 1491 of title 28 of the United States Code, and the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians shall be entitled to be represented in such proceedings, if they so desire, by legal counsel employed in conformity with the provisions of section 2103 of the Revised Statutes (25 U.S.C. 81). In the trial of any such suit the Court of Claims shall have jurisdiction to hear and determine any defenses available under the rules of law and equity applicable to contracts made by the United States, defenses of waiver or estoppel based on the course of dealing between the parties, and defenses based on mistake of law or fact, in-

cluding any failure to collect sums payable under the contract involved in such suit by reason of mistake of law or fact, and shall determine the liability, if any, of the parties defendant as the facts and law require. Parol evidence shall be admissible for the purposes of proving or disproving such defenses notwithstanding any limitation upon the admissibility of parol evidence in suits involving contracts in writing. Any set-off, counterclaim, claim for damages, or other demand set up on the part of any defendant shall be heard and determined by the court in accordance with the provisions of section 2508 of title 28 of the United States Code.

"Sec. 4. Any part of any judgment rendered hereunder which represents sums actually deposited to the credit of said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians for timber cut from tribal lands shall be paid by the Secretary of the Treasury, upon appropriation by the Congress, from any funds in the Treasury of the United States to the credit of said tribe. Any other part of any judgment rendered shall be payable in the same manner as in the case of claims over which the Court of Claims has jurisdiction under section 1491 of title 28 of the United States Code."

Plaintiffs are suing to recover the sum of $25,094.56, alleged to have been illegally collected by the defendant as a part of the contract price for certain timber sold by the defendant to the Algoma Lumber Company.

In a previous suit brought in the Court of Claims, the court, on January 12, 1938, rendered judgment in favor of plaintiff's predecessor in the amount of $25,094.56, Algoma Lumber Co. v. United States, 86 Ct.Cl. 226. The judgment was reversed by the Supreme Court, United States v. Algoma Lumber Co., 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260, on the ground

that Algoma's contract was not one with the United States but was with the Indians and that accordingly the Government was not liable for any breach thereof. Under the terms of the special jurisdictional act, quoted above, this court is now given jurisdiction to consider the claims under all the terms of the contract and to render judgment on such claims either against the United States in a fiduciary capacity for the Indian tribes, or against the tribes themselves.

There is no dispute concerning the facts in this case which the parties have stipulated and agreed shall be all the facts contained in the report of Court of Claims Commissioner I. M. Foster, filed April 24, 1937, including also any additional facts alleged in the petition and admitted in defendant's answer.

Insofar as material to a decision of the issues in this case, the facts are as follows:

On September 17, 1917, pursuant to the Act of June 25, 1910, 36 Stat. 855, 25 U.S.C.A. § 372 et seq., the Assistant Secretary of the Interior approved a contract entered into on July 28, 1917, by the Algoma Lumber Company and the superintendent of the Klamath Indian School, for and on behalf of the Klamath Indians, under which Algoma agreed to cut and remove certain timber from a specified area of the Klamath Reservation prior to April 1, 1932, and to pay for such timber its value as specified in the contract.

The contract was for a 15-year period and was divided into five 3-year periods ending on March 31 in 1920, 1923, 1926, 1929 and 1932. Just prior to the commencement of any 3-year period the contract gave the Commissioner of Indian Affairs the right to compare the cost of lumbering operations and manufacture with the prevailing market prices for lumber products in the area during the 3 years preceding January 1 of the year in which the new prices were to be fixed by the Commissioner for the purpose of determining whether or not the stumpage price paid by the purchaser should be adjusted. The determination of such new stumpage rates for the next 3-year contract period was left to the decision of the Commissioner, with the right in the purchaser to a hearing. The only limitation placed by the contract on the power of the Commissioner to advance stumpage rates was the following contract provision:

"* * * It is agreed further that the *advance* in stumpage rates as determined at the close of each specified period *shall not exceed fifty per cent of the increase in the average mill run wholesale net value of lumber* at mills in Southern Oregon and Northern California during the three years preceding January 1 of the year in which the new prices are fixed." [Italics supplied.]

The Algoma contract did not provide, as did the Forest Lumber Company contract, Forest Lumber Co. v. United States, Ct.Cl., 141 F.Supp. 953, that during any 3-year period the Commissioner might reduce stumpage rates previously fixed for such 3-year period.

The parties to the contract agreed that the average mill run wholesale price of lumber at the beginning of the first 3-year period of the contract was $15.75 for yellow pine, and $13.50 for white fir.

At the beginning of the second 3-year period of the contract, the average wholesale price of pine lumber for the 3 years just past was approximately $22.64. In view of the increase in that average wholesale price of lumber over the $15.75 stipulated average price for that period, the Commissioner of Indian Affairs notified Algoma that he was going to advance stumpage rates under the contract by 67 cents, effective April 1, 1920, the beginning of the second 3-year period. Although, under the strict terms of the contract, such an advance in stumpage rates, once imposed, would continue in effect for the entire 3-year period ending March 31, 1923, the Commissioner advised Algoma that if an investigation at the close of the year 1920 convinced him that the stumpage price

advance was too high, a reduction might be made for the years 1921 and 1922. Algoma replied that it accepted the proposed advance in stumpage price, and stated that it was grateful to the Commissioner for his promise to reconsider such advance in the succeeding 2 years with a view to a possible reduction. No reduction in stumpage rates during the second 3-year period was made by the Commissioner. Although the average wholesale price of lumber fluctuated sharply each year in that period, such prices remained higher than in any of the 3 preceding years. (Finding 5.)

At the beginning of the third 3-year period (April 1, 1923) of the contract, the average wholesale value of lumber for the 3 years just past (1920, 1921 and 1922) was approximately $34.22, representing a substantial increase over the average wholesale price of lumber (actual, not stipulated) for the first 3 years (1917, 1918 and 1919) of the contract. Accordingly, the Commissioner notified Algoma that effective April 1, 1923, the stumpage price for the next 3 years would be advanced 66 cents per thousand feet. Algoma accepted such advance in stumpage rates, but asked the Commissioner to review the situation the following year, as he had promised he would do in the previous period, to see whether or not a reduction in stumpage rates might be justified. The Commissioner assured Algoma that he would do this. During the course of this 3-year period no reduction in stumpage rates was made by the Commissioner, although, as the Commissioner knew, the wholesale lumber prices declined steadily during that period.

At the beginning of the fourth 3-year period of the contract (April 1, 1926), the average wholesale value of pine lumber for the 3 years just past (1923, 1924 and 1925) was $28.69, representing a substantial drop in the average wholesale price of lumber below the $34.22 average price for the 3-year period 1920, 1921 and 1922, and the Commissioner of Indian Affairs notified Algoma that there would be no advance in stumpage prices under its contract on April 1, 1926. Nothing was said by either party about reviewing the market situation the following year for the purpose of advancing or reducing stumpage rates during the 1926–1929 contract period.

In February 1927, the Commissioner notified Algoma that he was not going to advance stumpage rates under the contract on April 1, 1927. Algoma replied that it was at a loss to understand the Commissioner's communication inasmuch as the prior determination of the Commissioner in 1926 not to advance stumpage rates had the effect, under the contract, of definitely fixing the stumpage rates for the 3-year period 1926, 1927 and 1928. In his reply the Commissioner stated that in past years on the stumpage adjustment date provided for in the contract, Algoma had "consented" to leave to the Commissioner the question of possible *reductions* in stumpage rates *during* the current 3-year period. Algoma replied that on the occasion of the determination of the Commissioner not to advance stumpage rates as of April 1, 1926, the Commissioner had made no such reservation to review the situation at yearly intervals for the purpose of changing stumpage rates in or during the coming 3-year period. Algoma also pointed out that the contract provided for the fixing of stumpage rates but once every 3 years and that once fixed, the rate was to continue for 3 years with no power in the Commissioner to make any change. In the ensuing correspondence between Algoma and the Commissioner, the Commissioner took the position that the correspondence between the parties concerning the first two stumpage price advances had resulted in a modification of the contract which gave the Commissioner the right to adjust stumpage rates up or down every year if, in his opinion, the circumstances justified such action. In our opinion this was in error, especially insofar as any increase in rates was concerned.

Early in 1928, the Commissioner notified Algoma that stumpage prices under

its contract would be advanced 40 cents on April 1, 1928, to remain in effect 1 year. The year in question was the third and last year of that particular 3-year contract period and plaintiff properly protested that under the terms of the contract such an increase was not permissible *during* the 3-year period, and that cash advances or deposits which had been made by Algoma under the contract were not to be and could not be properly applied at a rate greater than the stumpage rate without such advance of 40 cents. The wholesale price of lumber for the year 1927 just past was $24.73, representing a drop from the wholesale price of lumber for 1926, which had been $26.36.

Wholesale lumber prices for the 3 years ending January 1, 1929, averaged approximately $25.28 and were lower than the wholesale lumber prices for the preceding 3 years, 1923–1925, which had been $28.45. Under the terms of the contract no advance in stumpage rates would have been permissible for the 3 years commencing April 1, 1929. However, just prior to that date, the Commissioner notified Algoma that a 40-cent increase imposed the previous year (1928) would continue in effect for another year (1929). Algoma duly and properly protested, as it had in 1928.

Early in 1930, the Commissioner notified Algoma that the 40-cent advance in stumpage rates would be in effect for an additional year and again Algoma protested the action taken.

In the court's decision, when this case was previously here in 1938, awarding Algoma a judgment representing the amount by which Algoma's stumpage rates had been improperly and illegally advanced in 1928, 1929 and 1930, the court merely stated that the facts and legal issues in the case were in all essential respects similar to those in Forest Lumber Co. v. United States, 86 Ct.Cl. 188, and that accordingly the court's decision in the Forest case controlled the decision in the Algoma case.

The primary basis for recovery assigned by the court in the Forest case was that the stumpage advances made by the Commissioner, and complained of by the Forest Lumber Company, had been made in violation of the 50 percent limitation provision contained in the Forest contract. Defendant now requests the court to reconsider its decision in the Algoma case because it now says that the contract provisions in the Algoma contract were different from those in the Forest contract, and that the facts and circumstances surrounding the stumpage rate advances made by the Commissioner and complained of in the Algoma case raise issues of law different from those raised in the Forest case.

The main difference in the two lumber contracts was that in the Forest contract the Commissioner of Indian Affairs had the express power and authority to reduce a stumpage rate previously set at the beginning of any 3-year period so long as the resulting rate was not less than the rate for the first 3-year period. In the Algoma contract, the Commissioner had no such express right. In all other material respects the contracts in the 2 cases were identical: stumpage rates were fixed by contract for the first 3 years and were subject to adjustment by the Commissioner according to a method prescribed in the contract at the beginning of each succeeding 3-year period; any advance in stumpage rates might not exceed 50 percent of the increase in wholesale lumber prices for the 3 years just prior to the adjustment date over the earlier 3 years, and stumpage rates fixed at the beginning of a 3-year period were to prevail for the entire 3-year period except, in the Forest contract, the Commissioner might by express provision make an interim reduction in such rate.

In the Forest case the court found and decided that because there had been an actual *decrease* in wholesale lumber prices in the 3 years just prior to the imposition of a stumpage rate advance imposed by the Commissioner, the rate

advance imposed was in violation of the contract. In the instant case, the stumpage increases imposed on Algoma in the 1926–1928 period, and in the 1929–1931 period, were likewise imposed in the face of the fact that wholesale lumber prices had been dropping just prior to each 3-year period in question. Accordingly, the court was correct in holding that its ruling in the Forest case was applicable to the issues in the Algoma case, unless, as now contended by defendant, plaintiff in Algoma is in some way estopped to make the claim it has made or has waived its right to recover back the sum of money which was exacted from it.

Defendant urges that under the facts and circumstances of this case, plaintiffs are estopped to complain that the Commissioner of Indian Affairs did not comply with the terms of the contract when he ordered an increase of 40 cents in the stumpage price on April 1, 1928, which remained in effect through March 31, 1931. The defendant takes the untenable position that on the facts during the 2 price adjustment periods from 1920 to 1926, Algoma induced the Commissioner to depart from the contract terms requiring stumpage price adjustments to be made, if at all, at the beginning of a 3-year period specified in the contract to remain in effect unchanged during that period, and to be based on any *increase* in the average wholesale value of lumber during the previous 3-year period; that, instead, the defendant says, we think erroneously, that the parties by their conduct agreed that stumpage rates should be determined by the Commissioner *every year* on the basis of the then current market conditions, and that the 40-cent stumpage rate advances made in 1928, 1929 and 1930 were made by the Commissioner relying on that understanding.

Defendant relies on cases involving the doctrine of equitable estoppel, particularly the case of Hubshman v. Louis Keer Shoe Co., 7 Cir., 129 F.2d 137, 140, in which the court held:

"* * * It is well established that one cannot by a *long course of conduct* lead another to believe that he will not insist upon the strict performance of a duty imposed by law or contract, and then without notice insist upon strict performance. * * *" [Italics supplied.]

As pointed out by defendant, the doctrine of equitable estoppel is designed to prevent results contrary to good conscience and fair dealing, and to insure that the person who has been the cause or occasion of a condition by which a loss has been caused would be the one to bear such loss. The party relying on an estoppel has the burden of proving its component elements and his opponent is not required to show the absence of any of them. Ross v. Commissioner, 1 Cir., 169 F.2d 483, 7 A.L.R.2d 719. The substance of equitable estoppel is the reasonable reliance by the party claiming it upon some representation or course of conduct of the other party which will injure the relying party if the other party is permitted to assert the existence of a state of facts at variance with his prior representations. A party may not base a claim of estoppel in his favor upon his own dereliction of duty or on acts or omissions induced by him by his own conduct or representations. Sedlak v. Duda, 144 Neb. 567, 13 N.W.2d 892, 154 A.L.R. 490.

Defendant argues that Algoma induced the Commissioner of Indian Affairs to depart from the written contract provisions and requirements for stumpage rate adjustment during the period 1920–1926; that in reliance upon the actions and representations of Algoma, the Commissioner believed that Algoma had agreed to *yearly* reconsideration of stumpage prices on the basis of *current* market conditions, and that the three 40-cent increases in stumpage price imposed from April 1, 1928, through March 31, 1931, were made in accordance with the manner in which Algoma had induced defendant to interpret the contract. The provisions of the contract were clear and

unambiguous and the defendant clearly knew what those provisions were.

The first suggestion that the contract terms relative to stumpage price adjustments be departed from came from the defendant itself and not from Algoma when, in 1920, the Commissioner of Indian Affairs advised Algoma that he would reconsider in the following year the 67-cent advance in stumpage rate to be imposed for the next 3-year period, with a view to a possible reduction in such advance if market conditions should warrant. Although Algoma agreed to such a reconsideration, no actual change in the stumpage rate was in fact made by the Commissioner during that 3-year contract period.

It is true that on the occasion of the next stumpage rate adjustment date, Algoma was the one to suggest that the rate advance imposed by the Commissioner for the next 3 years should be reviewed each year with a view to a possible *reduction*, and the Commissioner consented to do so. But again, no reduction or change in the rate advance was made by the Commissioner during the ensuing 3-year period. It is also significant that both advances in stumpage rates made by the Commissioner appear to have been based on an increase in the average wholesale price of lumber in the 3 years just preceding the stumpage adjustment date as called for by the contract.

On the occasion of the next stumpage price adjustment date on April 1, 1926, the Commissioner notified Algoma, as he had the right to do, that no advance in stumpage rates would be imposed, and on that occasion the Commissioner made no reservation, one way or the other, of the right to review the matter during the next 3-year period. No request for such a review was made by Algoma. Under the terms of the contract, market conditions in the lumber industry were such that no advance in stumpage rates should have been imposed because the wholesale price of lumber had declined. When, in the second year of that 3-year period (1927), the Commissioner notified Algoma that he was not going to impose an advance in stumpage rates for the year 1927, Algoma notified the Commissioner in effect that it would expect the contract terms regarding stumpage rate adjustments to be complied with and that the contract did not permit a change in rates *during* a 3-year period, but only at the beginning thereof. Algoma also pointed out that the wholesale lumber prices did not justify any advance in stumpage rates for the period in question, and the facts of record, discussed earlier herein, support that position.

When the Commissioner of Indian Affairs imposed the 40-cent advance in stumpage rates on April 1, 1928, which date was the beginning of the last year of that particular 3-year period, the Commissioner was on notice that Algoma was insisting upon strict compliance with the stumpage rate adjustment provisions of the contract and thus it cannot be said that the Commissioner made the interim advance in rates relying on representations by Algoma that it would accept such an advance made contrary to the terms of the contract both as to time and without any basis because of an actual decrease in wholesale lumber prices. Up to that time there had been no *actual* departure from the contract terms concerning stumpage rate adjustments. Between 1920 and 1926, there had merely been correspondence discussing the *possibility* of such a departure. Any understanding that there *might* be a departure from the contract terms was completely dissipated by the correspondence in 1927 and 1928. The first actual departure from the clear terms of the contract by the Commissioner in 1928, was not made with any reasonable reliance that Algoma would accept such an interpretation of the contract. Obviously the fact that Algoma had at an earlier date consented to permit the Commissioner to review a stumpage advance which he made in 1920, and again in 1923, with a view to a possible future *reduction* thereof, did not justify the Commissioner or mislead him

into supposing that Algoma would agree in 1928 to an interim *advance* in stumpage rates in 1928, 1929 and 1930 not justified by market conditions and following several notices on the part of Algoma that it expected strict compliance with the contract terms concerning stumpage price adjustments.

Under the above circumstances, we are of the opinion that the defendant has clearly failed to establish those elements of estoppel which would make it inequitable to require the defendant to respond in damages to plaintiffs' otherwise valid claim under the contract. The 40-cent increase in stumpage rates imposed by the Commissioner in 1928 and remaining in effect until March 31, 1931, was in violation of the express terms of the contract, as pointed out above, and such increase was not made in any reasonable reliance on any representations or course of conduct by Algoma that the Commissioner's interpretation of the contract was agreed to by Algoma.

As to defendant's argument that plaintiffs are not entitled to recover the amount of the alleged overpayments resulting from the stumpage price increases in 1928, 1929 and 1930, because such payments were made by Algoma voluntarily and not under duress, what we have said in the Forest Lumber Co. case, on this same argument, applies equally in the instant case. Because Algoma had made a deposit or had paid in advance for all stumpage to be cut under the contract, the most it could do when the improper advance in stumpage rates was imposed, was to protest and notify defendant not to charge its account with the amount of such increase. There was no voluntary payment.

The jurisdictional act provides for the payment of any judgment made by the court as follows:

"Sec. 4. Any part of any judgment rendered hereunder which represents sums actually deposited to the credit of said Klamath and Modoc Tribes and Yahooskin Band of Snake Indians for timber cut from tribal lands shall be paid by the Secretary of the Treasury, upon appropriation by the Congress, from any funds in the Treasury of the United States to the credit of said tribe. Any other part of any judgment rendered shall be payable in the same manner as in the case of claims over which the Court of Claims has jurisdiction under section 1491 of title 28 of the United States Code."

Plaintiff is entitled to recover the amount of $25,094.56 and judgment is rendered therefor. In view of the above-quoted provision of the special jurisdictional act, payment of that part of the judgment which shall be paid in the same manner as in the case of claims over which this court has general jurisdiction under section 1491 of title 28 of the United States Code (i. e. by Congressional appropriation), will be suspended pending the making of a stipulation by the parties or a determination by the proper Government officials of the amount so to be paid, in accordance with Rule 38(c), 28 U.S.C.

It is so ordered.

JONES, Chief Judge, and LARAMORE and MADDEN, Judges, concur.

WHITAKER, Judge, took no part in the consideration or decision of this case.