**DEE HONG LUE, to the Use of CENTRAL SYNDICATE, a Corporation,**

v.

**UNITED STATES.**

No. 49358.

United States Court of Claims.

July 15, 1960.

Monroe Oppenheimer, Washington, D. C., for plaintiff. Sher, Oppenheimer & Harris, I. G. Alk, Washington, D. C., and Alexander Sycip, Manila, The Philippines, were on the brief.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

In July 1946, the plaintiff purchased from the Foreign Liquidation Commission a mass of surplus property located near the town of Tacloban on the island of Leyte. Plaintiff's suit in this court is based on an alleged substantial shortage in the quantity of surplus materials delivered.

In March 1946, the United States Army made a declaration of surplus property to the Manila office of the Foreign Liquidation Commission (FLC), the agency authorized to sell war surplus. Cases purportedly containing the material referred to in the declaration of surplus were stored in the open in approximately 25 separate piles within an area approximately 100 yards long by 50 yards wide, near the town of Palo, about 12 kilometers from the larger port town of Tacloban, on the island of Leyte. Tarpaulins were stretched over the individual piles and nailed to the cases. Since a single tarpaulin was not big enough to cover one of the individual piles, the tarpaulins were so arranged that they overlapped. The contents of the individual piles could be seen only to the extent possible by peering through the spaces where the tarpaulins overlapped.

This mass of surplus was generally known as the "Mystery Pile" because no detailed inventory had ever been made of it, and the quantities and descriptions in the surplus declaration were only esti-

mated. The declaration described the material and its weights as follows:

Automotive parts ........ 5,700,000 lbs.
Standard hardware ...... 1,140,000 lbs.
Tools ................. 1,710,000 lbs.
C & P material .......... 570,000 lbs.
Miscellaneous spare parts
 and accessories........2,280,000 lbs.
 Total ......... 11,400,000 lbs.

In the spring of 1946 copies of the surplus declaration listing the property purportedly comprised in the Mystery Pile were made available by officials of FLC to persons likely to be interested in purchasing the Pile. When the list came to the attention of the plaintiff, he discussed the possibility of buying the Mystery Pile with various persons, including Normine Watkins, a former American soldier who had been discharged from the service in the Philippines and had entered the business of buying and selling surplus property. Watkins had seen the Mystery Pile as early as January 1946. Late in March and early in April 1946, he had spent three weeks making an inventory of the Pile.

Watkins discussed the contents of the Mystery Pile with the plaintiff at length and gave the plaintiff a list of its contents, made up from his inventory. Watkins' list identified, in greater detail than the surplus declaration, the kind and number of units of various components of the Pile. It also mentioned the presence of weapons. It gave no information, however, tending to suggest that the aggregate poundage of material present in the Pile was less than the poundage stated in the surplus declaration. In addition, one of plaintiff's own representatives, David Dy, was sent on May 23, 1946, to inspect the Mystery Pile. He inspected the Mystery Pile without military supervision for several hours and observed the contents of the Pile by looking through openings where the tarpaulins overlapped. Upon his return to Manila, he reported his observations to plaintiff.

Plaintiff contracted to purchase the Mystery Pile for 1,250,000 pesos ($625,-000) some time during the first or second week of July 1946. The contract provided for the sale of "all that property located at Base K, Leyte * * * consisting of approximately 5,700,000 lbs. of automotive parts, 1,140,000 lbs. of standard hardware, 1,710,000 lbs. of tools, 570,-000 lbs. of C & P Material (K Group), and 2,280,000 lbs. of Mis. Spare parts & accessories." This description of the material sold to plaintiff is identical to the description contained in the Army's declaration of surplus property.

Two other articles of the contract are material to this case. Article 3 of the contract states that "the Buyer will take full possession of each lot of property transferred hereunder upon the *completion* of the *actual inventory* thereof * * *," (emphasis supplied) and that "[t]he United States agrees to retain sufficient personnel at the location of the property to insure that all the property transferred hereby is inventoried as soon as possible but in any event within sixty (60) days after execution of this contract." Article 8, the provision under which plaintiff seeks to recover, provided that *adjustments* in the purchase price would be made for variations between the weight of the five categories of property enumerated in the contract and the weight of the property actually delivered. After setting out the rate of adjustment for each category of property, Article 8 then provided that "[a]ny claim for such adjustment shall be presented to either party, as the case may be, *within thirty (30) days* after the date the Vendor's Shipping Documents are signed and accepted and *shall be substantiated by proper notation on the Vendor's Shipping Documents* made at the time of delivery." (Emphasis supplied.)

On July 18, 1946, David Sycip was appointed plaintiff's attorney in fact to take possession of the Mystery Pile and to perform all necessary functions in connection with it. On July 23, 1946, Sycip went to Leyte with several assistants to take delivery of the Mystery Pile. Upon his arrival he presented the contract to the Army officer in charge of the Mystery Pile and designated as contracting offi-

cer on the vendor's shipping documents, and discussed with him the taking over of the Mystery Pile. Sycip was advised by this Army officer that the warranty provisions of the contract as to quantities were not in accordance with the Army declaration of surplus—that the quantities of the various categories of material represented to be in the Pile had been estimated by the Army in good faith, but that it was not intended by the Army that specific weights should be guaranteed. The Army representative also stated that it was not feasible to make an inventory on the delivery basis called for in the contract.

Immediately following this conversation, Sycip went to the Mystery Pile, paced off the dimensions of the several piles, and made a general visual inspection of the Pile. However, the Army officer who accompanied him did not permit him to remove any of the tarpaulins that covered the Pile. Thereafter, on that same day, Sycip sent the following telegram to Yu Khe Thai, who later became president of Central Syndicate, the corporation which subsequently acquired the Mystery Pile:

"Army insists acceptance be as is without adjustments for shortages from weights in documents Stop Sy Singsui and we believe this acceptable Confirm immediately Stop Dont send other men until further notice Stop Sy returning Thursday."

In the evening of the following day, July 24, Yu Khe Thai sent Sycip the following reply:

"All right to accept as is without adjustments for weight shortages However for our protection considerate [sic] advisable to reserve right to claim in case of major shortages."

Meanwhile, during the day of July 24, 1946, Sycip measured the cubature of the Pile with a tape measure and checked the descriptions of the material as listed on wooden markers nailed to the sub-piles, which purported to give their over-all dimensions and describe their contents.

On the basis of these measurements, Sycip estimated the cubature of the Pile at *407,837* cubic feet. He discounted this figure by 25 percent to allow for air spaces, and then converted the estimated cubature into pounds on the basis of 35 pounds per cubic foot—the figure which, on the basis of his prior experience, he believed to represent the average weight of hardware packed in unit packing cases. (Plaintiff's evidence shows that, in fact, the Pile averaged out to 34.8 pounds per cubic foot.) The resulting figure was close to 11,000,000 pounds, approximately the poundage shown in the contract.

On July 25, 1946, after he had received Yu Khe Thai's telegram, Sycip signed the following statement on the vendor's shipping document:

"I certify that I and my representatives have inventoried the 'Mystery Pile' (COQ 383, VSD 5918, 9 July 1946), that I am satisfied that the equipment listed on VSD 5918 is present, and that I have received it this date."

After this certificate was executed on the vendor's shipping document, the plaintiff's agents assumed possession of the Mystery Pile.

At this juncture, the Government raises the contention that the certificate executed by Sycip constitutes a release, and is therefore a bar to the assertion of plaintiff's claim. We cannot agree. The Army officer in charge would not permit plaintiff's representatives to remove the tarpaulins, and thereby prevented any possibility of an accurate inventory prior to delivery. Furthermore, Sycip was certainly justified in believing that the Army officer in charge of the Mystery Pile was acting for the FLC in refusing to cooperate in a predelivery inventory. Under the circumstances, we see no alternative but to hold that the certificate was merely a receipt, which could be contradicted by parol evidence, and not a release.

Nor do we agree with the defendant's contention that plaintiff's assertion of his claim was not timely. The contract required that "[a]ny claim for * * *

adjustment shall be presented * * * within thirty (30) days after the date the Vendor's Shipping Documents are signed and accepted and shall be substantiated by proper notation on the Vendor's Shipping Documents * * *." Sycip signed the vendor's shipping documents on July 25, 1946.

Some time during the latter part of August 1946, after the first reports of the inventory being made of the material in the Mystery Pile began to reach Manila, the possibility occurred to plaintiff's representatives in Manila that the aggregate quantity of material in the Pile might be substantially short of the amount specified in the contract. A representative of the plaintiff then called upon an official of FLC and orally requested that a representative of FLC investigate the situation in Leyte, but apparently no one was sent until the middle of September. On September 2, 1946, a representative of the plaintiff wrote to FLC detailing the information which it had concerning a possible shortage, and again requested FLC to investigate.

On or about September 18, 1946, an official of the FLC named Salzman came to Leyte and made an inspection of the Pile, including portions that had not been disturbed. The arrangement of the cases in the piles, which plaintiff claims left gaping empty spaces between the piled cases, was pointed out to this official. In addition, he was shown the methods used by plaintiff's representatives in keeping track of the quantities of material in the Pile and the method of classification being used by the plaintiff in keeping a record of such material. Salzman did not comment to plaintiff's representatives on these disclosures, and the record contains no evidence of any report he may have made to the FLC.

The plaintiff subsequently submitted a written claim to the FLC for the alleged shortage and for the arms and parts turned in to the United States Army. An adjustment was made for the arms, but the FLC denied the claim for shortage on the ground that plaintiff's representative had certified that all the property purchased had been delivered, that plaintiff's representatives had utilized 13 days in inspecting the property purchased prior to delivery (a fact not shown in the record), and that the claim was not presented to the FLC within the 30-day period specified in Article 8 of the contract.

The provision in the contract restricting the time within which a claim for adjustment could be presented obviously contemplated a predelivery inventory by the plaintiff participated in by the defendant. We do not believe that the Government, after refusing to cooperate in such an inventory, should be permitted to insist on compliance with this provision of the contract. Furthermore, the actual inventory took more than 30 days, and it would therefore have been impossible, without a predelivery inventory, for plaintiff to have asserted a claim for any shortage discovered after the 30-day period set by the contract. The contract itself provided for the making of a predelivery inventory of the property by the plaintiff within 60 days of the signing of the contract.

The plaintiff should, of course, be required to present his claim within a reasonable time after a shortage was discovered. Under the circumstances we think the claim for adjustment was timely.

The Government next asserts that the plaintiff is estopped from asserting this claim. It was, of course, contemplated that the inventory of the property by the plaintiff would be checked and verified contemporaneously by Government representatives, and that any discrepancies would be evidenced by notation on the vendor's shipping documents. Nevertheless, Sycip, the plaintiff's attorney in fact, certified on July 25 that he had inventoried the Mystery Pile, that he was satisfied that all property sold was present, and that he had received it. Moreover, he did so after receiving the telegram from Yu Khe Thai instructing him that "for our protection considerate [sic] advisable to reserve right to claim in case of major shortages." The Government

contends that this certificate lulled the FLC into a false sense of security and that consequently no personnel were assigned to the Mystery Pile to verify plaintiff's inventory—since plaintiff stated that he had already made one; no contemporaneous attempt was made to reconcile any discrepancies—since plaintiff stated that he was "satisfied that the equipment listed * * * is present;" and no attempt was made to guard against the removal of uninventoried property by plaintiff, his employees or third persons—since plaintiff represented that he had taken over full possession and control of the property as of the date of his certification.

 It is of course familiar law that "[t]he substance of equitable estoppel is the reasonable reliance by the party claiming it upon some representation or course of conduct of the other party which will injure the relying party if the other party is permitted to assert the existence of a state of facts at variance with his prior representations." However, "[a] party may not base a claim of estoppel in his favor upon his own dereliction of duty or on acts or omissions induced by him by his own conduct or representations." Birkelund v. United States, 1956, 142 F.Supp. 459, 135 Ct.Cl. 503, 513. We are not convinced that the equities in this case demand that plaintiff be estopped from asserting his claim. The same factors which prompted us to hold that the certificate did not constitute a release are decisive here. We think that the plaintiff was justified in believing that the Army officer in charge of the Mystery Pile was acting for the FLC in refusing to cooperate in a predelivery inventory, and that the Government may not now assert that it altered its position by failing to provide personnel to verify the inventory.

The final question to be considered is whether the plaintiff has proved that a shortage did in fact exist, and, if so, the extent of that shortage. Plaintiff's claim that a shortage existed is based primarily upon the classification sheets prepared by plaintiff's labor crews at the site of the Mystery Pile as they inventoried the material preparatory to shipment.

The plaintiff's calculations taken from the classification sheets purported to show that 5,483,618.7 pounds of material shipped from Leyte had been credited to the Pile. In addition, the Pile was credited with 133,808 pounds of arms and parts which were recovered by the United States Army in Leyte (for which adjustments were made), and 652,000 pounds of "military type" material which were left on Leyte. External measurements indicated that there were 28,400 cubic feet of this "military type" material left on Leyte, but this figure was apparently rounded off to 28,000 and was then discounted by 33 percent for poor piling. The record does not show the weight realized from this material and provides no basis for discounting the weight by 33 percent or any other amount. Therefore we think the Mystery Pile should be credited with at least 988,320 pounds for this material, rather than the 652,000 pounds credited by the plaintiff.

The plaintiff also credited the Pile with certain unclassified material, such as tarpaulins, wood pallets, and material lost by fire, which brought the total weight credited to the Pile to 6,514,466 pounds. This left an alleged shortage of 4,885,534 pounds. We believe that a shortage did exist, but we are not satisfied that it was as great as the plaintiff claims.

There are several factors in the record which cast doubt on the plaintiff's calculation of the alleged shortage. The plaintiff claims that the markers which the Army had nailed to the various sub-piles in the Mystery Pile indicated that the Pile contained *407,837* cubic feet of material. David Sycip, the plaintiff's representative who measured the sub-piles with a tape measure just prior to his signing of the vendor's shipping documents, testified that the measurements and the cubature shown on the markers were substantially correct. There is further testimony that the Army had even understated the cubature.

The plaintiff's classification sheets purported to show, however, that the Pile contained only *157,325* cubic feet of classified material, in addition to approximately 28,400 cubic feet of "military type" material left in Leyte, and 3,823 cubic feet of arms and parts recovered by the United States Army in Leyte. This amounted to approximately *189,548* cubic feet of material, and is only 46 percent of the cubature which the external measurements indicated the Pile contained. Consequently, when the plaintiff's agents removed the tarpaulins from the various sub-piles, an average of *54 percent* of the space under the tarpaulins was presumably occupied by nothing more substantial than air. And, according to the evidence presented by plaintiff, at least 60 percent of the space under the tarpaulins covering some of the supplies was vacant.

It is inconceivable that these yawning gaps in the sub-piles would not have been instantly apparent to the men supervising the inventory. Sycip left Leyte and returned to Manila before the inventory began on July 26. But the representative of plaintiff who stayed on to supervise the inventory was with Sycip when the sub-piles were measured, and he undoubtedly knew the reason for the measuring and that the existence of a shortage would entitle his principal to an adjustment in the purchase price. Furthermore, the man who was sent to take charge of the inventory on August 2 was aware that Sycip had been criticized for signing the certification on the vendor's shipping documents and therefore certainly knew that the existence of a shortage would affect the contract price.

Five seven-man work crews were engaged at the outset to inventory the Mystery Pile. According to the man in charge of supervising the inventory these various crews worked on several sub-piles at a time. And yet, plaintiff's evidence shows that it was not until after the first reports of the inventory in Leyte began to reach Manila—*some three or four weeks after the commencement of the inventory*—and were compared with the preinventory external measurements of the sub-piles that the possibility occurred to plaintiff's agents that the aggregate amount of material in the Pile might be short of the amount specified in the contract.

The only reasonable conclusion to be drawn from the sequence of events is that plaintiff's agents at the site supervising the inventory were not aware of the 54 percent shortage which plaintiff now claims existed, because a shortage of this magnitude did not, in fact, exist.

The record affords several explanations for at least part of the difference between the 11,400,000 pounds of material which plaintiff contracted to buy and the lesser amount actually credited to the Pile. Some of the material was lost in a fire during the early stages of the inventory. Plaintiff estimated that the *unclassified* material lost in the fire amounted to 25,500 pounds. But there is no evidence in the record which would indicate a basis for this figure.

The man in charge of the inventory at Leyte admitted that some of the material was stolen, and that at least one of the thieves had been caught. He testified, however, that these thefts did not involve more than 200 cases of material, but later admitted that there was absolutely no way of determining how many cases had been stolen.

The looting of material was facilitated by the simple but ingenious device employed by the labor crews of numbering cases in duplicate. Of the two (or possibly more) cases which were given the same classification number, only *one* would be credited to the Pile. When the other case was subsequently stolen its loss would therefore not show up in the inventory records. In the circumstances we cannot attribute these inventory records with any great degree of accuracy.

There is a great deal of testimony in the record relating to the discovery of weapons in the Mystery Pile and in cases shipped to Manila from the Mystery Pile. The Government was apparently attempting to show that the plaintiff intended to sell the arms illegally. There is no evidence that such was the plaintiff's intent.

Nor is there evidence that the cases containing arms were not credited to the Pile.

However, we find that the testimony relating to the discovery of arms in cases shipped to Manila raises some questions as to the care with which the inventory was undertaken and as to the reliability of the testimony of those witnesses who also testified as to the alleged shortage. It is a fact that almost 75,000 pounds of arms were recovered by the Manila police and the United States Army from plaintiff's Manila warehouses, but that they were not classified as arms on the inventory or shipping records. Sycip's explanation for this oversight was that the cases containing arms were not clearly marked, and that if they had been marked they would definitely not have been shipped to Manila. If this is true we cannot concur in plaintiff's claim that the classification or inventory made by plaintiff's employees was done carefully and correctly. In contrast to Sycip's testimony, the representative which plaintiff sent to direct the inventory on Leyte testified, after some hesitation, that the cases containing arms had markings which indicated their contents.

In the circumstances, we think that there was a shortage in the material delivered to plaintiff, but we are not convinced that this shortage was as great as the plaintiff now claims. It is impossible to accurately determine the exact amount of the shortage, but based on the evidence as a whole and resolving as best we can the conflicting testimony we find on the basis of a jury verdict that the record is sufficiently clear to establish a loss of $60,000 and judgment will be entered for plaintiff in that amount.

It is so ordered.

DURFEE, LARAMORE and MADDEN, Judges, concur.

WHITAKER, Judge (concurring).

The despotic, arbitrary conduct of the Army officer in charge of the "Mystery Pile" was the genesis of all the trouble in this case. By his own *ipse dixit* he threw out of the window the provisions of the contract and forced upon plaintiff a course of conduct at variance with the contract, and one that made it impossible for him to comply with some of his obligations under the contract. For this he is to be excused.