**GLAZER STEEL CORPORATION**

v.

**The UNITED STATES.**

**No. 215–64.**

United States Court of Claims.

Dec. 15, 1967.

Alfred H. Moses, Washington, D. C., attorney of record, for plaintiff, Franklin J. Okin, Diana H. Josephson, and Covington & Burling, Washington, D. C., of counsel.

Donald T. Fish, with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant, Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on September 21, 1967. On November 1, 1967, plaintiff filed a motion for adoption of the commissioner's report and the entry of judgment for plaintiff in accordance therewith. Defendant has filed no exceptions to the commissioner's findings, opinion, and recommended conclusion of law, nor to plaintiff's motion of November 1, 1967, and the time for so filing has expired pursuant to the Rules of the court. Since the court agrees with the commissioner's findings, opinion and recommended conclusion of law with modifications, as hereinafter set forth, it hereby adopts the same, as modified, as the basis for its judgment in this case without oral argument. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff with the amount of recovery to

be determined pursuant to Rule 47(c) in accordance with the opinion.

Commissioner Fletcher's opinion, as modified by the Court, is as follows:

In this tax case the plaintiff seeks to recover corporate income taxes attributable to defendant's refusal to allow a deduction for depreciation, during the first seven months of 1956, on plaintiff's unrecovered cost basis for a brick office building, known as the Exchange Building, located on Ailor Avenue in Knoxville, Tennessee. In opposing plaintiff's recovery, defendant asserts that plaintiff had no depreciable interest in, and did not actually use, the building for its own business purposes during the period involved. In the alternative, defendant contends that plaintiff is estopped from claiming depreciation because of a failure to disclose to the Internal Revenue Service that it continued to use and occupy the Exchange Building for its general offices subsequent to December 31, 1955.

The facts in the case are set forth at length in the findings of fact below. Here they will be summarized only to the extent necessary to explain the basis for the conclusions reached in this opinion.

Plaintiff is a Tennessee corporation. At all material times, its outstanding capital stock was closely held by three brothers, Guilford, Louis, and Jerome Glazer. The corporation's principal business activity was the buying, selling, warehousing, and fabricating of steel at 2100 Ailor Avenue in Knoxville, Tennessee. It also bought and sold scrap metals. Beginning in the spring of 1949 and continuing through the taxable year in question, plaintiff was also engaged in the buying, selling, and warehousing of steel and other metal products in New Orleans, Louisiana. During the times material, Guilford and Louis Glazer were plaintiff's president and vice-president, respectively, with their offices in the Exchange Building at Knoxville. Their younger brother, Jerome, was the general manager of plaintiff's operations in New Orleans and had his office in that city.

For a number of years prior to November 14, 1955, plaintiff had leased most of the premises known as 2100 Ailor Avenue in Knoxville from The Trustee Corporation (Trustee). The majority of the outstanding stock of Trustee was held or controlled by the three Glazer brothers mentioned above; the rest of the stock was owned by other members of the Glazer family. During the period that plaintiff leased the Ailor Avenue property, it had made various leasehold improvements thereto including the construction of a steel fabrication shop, a warehouse and machine shop, a modern brick office building (the Exchange Building), and miscellaneous service buildings. The approximate cost to plaintiff of all these leasehold improvements was $300,000. The lease between plaintiff and Trustee provided that such leasehold improvements were to become the property of Trustee upon termination of the tenancy for any reason. In its income tax returns for 1953, 1954, and 1955 plaintiff had deducted and was allowed depreciation on these leasehold improvements. As of December 31, 1955, plaintiff's remaining depreciable basis for the Exchange Building alone was $124,752.

During 1955 plaintiff continued to be actively engaged in the steel business in Knoxville but its operations there were declining and were not profitable in contrast to those in New Orleans. Sometime in the summer or early fall of 1955, the opportunity was presented to The Trustee Corporation to lease the Ailor Avenue working plant facilities (but not the Exchange Building) to Allied Structural Steel Corporation of Tennessee (Allied), a party in no way related to, or connected with, the Glazer family. The proposed lease was for a comparatively long term and at a considerably more favorable rental than was provided for in the existing lease between plaintiff and Trustee. In order that Trustee might take advantage of Allied's proposal, it was agreed between plaintiff and Trustee that the existing lease agreement between them relating to 2100 Ailor Avenue would be canceled in its entirety. In consideration for such cancellation, Trustee agreed to

pay plaintiff $200,000 in equal monthly installments over a period of 10 years commencing January 1, 1956. The lease cancellation agreement incorporating the aforesaid provisions was entered into on November 14, 1955, to be effective December 31, 1955. By agreement dated November 16, 1955, Trustee leased most of the land and buildings located at 2100 Ailor Avenue to Allied for a term of 20 years commencing January 1, 1956. However, the lease to Allied did not include the Exchange Building. At the same time that plaintiff and Trustee agreed to cancel their existing lease, it was orally agreed between them that plaintiff would be entitled to continue its use and occupancy of the Exchange Building as long as it desired, without the payment of any rent. This rather unusual arrangement reflected the fact that, at its own expense, plaintiff had constructed the Exchange Building in 1953, and that Trustee, which would become the owner of the building, had not incurred any substantial expense in connection therewith. Therefore, the agreement for rent-free occupancy of the Exchange Building by plaintiff was a factor in arriving at the figure of $200,-000 to be paid by Trustee to plaintiff for cancellation of its Ailor Avenue lease.

Pursuant to the above arrangement, plaintiff continued to occupy the Exchange Building during the taxable period in question and to use it as its general executive and administrative offices just as it did in previous years. No significant change occurred in either the personnel who continued to occupy the building or in their duties and responsibilities. These persons included plaintiff's president, vice-president, comptroller and office manager, chief accountant and the entire accounting department, together with general secretarial and clerical help. Plaintiff's furniture and equipment remained in the building, and plaintiff continued to pay for maintenance and repair of the building, including all utility costs and related expenses.

The Exchange Building continued to serve as the general offices of plaintiff until November 1959, when the books and records, furniture and equipment, accounting office and remaining executive functions (including important personnel other than Guilford Glazer) were moved from Knoxville to New Orleans. At that time plaintiff vacated and abandoned all use of the Exchange Building.

### The Depreciation Issue

The first question, stated in the circumstances of this case, is whether a lessee, such as plaintiff, who occupies and uses business premises as a tenant for an indefinite term with it alone having the power to terminate such tenancy, which tenancy follows the cancellation of a preexisting lease for a term of years, may continue to claim a depreciation deduction on its Federal income tax returns for a ratable portion of its unrecovered cost basis in leasehold improvements made by it, or is such lessee required to deduct the entire remaining amount of the undepreciated cost basis in the year when the preexisting lease was canceled? Although it originally took a different position in its tax return for the period involved, plaintiff now says that under section 167 of the 1954 Code and the regulations promulgated thereunder, it is entitled to a depreciation deduction because, despite the cancellation of the preexisting lease, it had the right, which it exercised, to continue its use and occupancy of the Exchange Building on which it had an unrecoverd cost basis. In my judgment, plaintiff's present position is correct, and it is, therefore, entitled to recover.

Section 167 of the 1954 Code permits a deduction for depreciation in the form of "a reasonable allowance for the exhaustion, wear and tear * * * (1) of property used in the trade or business * * * " Insofar as leased property is concerned, the Treasury Regulations implement the section by providing:

Capital expenditures made by a lessee for the erection of buildings or the construction of other permanent improvements on leased property are recoverable through allowances for

depreciation or amortization. Treas. Reg. § 1.167(a)–4., T.D. 6520 (1960).

The regulations also provide for the recognition of loss where a taxpayer retires an asset by actual physical abandonment. See Treas.Reg. § 1.167 (a)–8(a)(4) (1956). Hence, one circumstance under which a lessee must write off the entire remaining cost of his leasehold improvements, rather than depreciate or amortize such cost, occurs in the year when he irrevocably abandons his right to occupy and use those improvements. By the same token, however, so long as the lessee has, and exercises, his right to use and occupy the leasehold improvements, he can recover his costs therefor only through annual depreciation deductions spread ratably over the useful life of the property or over the term of his lease, whichever is shorter. See Gladding Dry Goods Co., 2 B.T.A. 336 (1925); Fort Wharf Ice Co., 23 T.C. 202 (1954); and Treas.Reg. § 1.167(a)– 4, T.D. 6520, supra.

Under these principles, it is obviously of first importance to determine whether plaintiff had the right to, and did continue, its use and occupancy of the Exchange Building after December 31, 1955, or whether it must be said to have lost that right and to have abandoned the building pursuant to its agreement to cancel its Ailor Avenue lease effective December 31, 1955.

The facts as summarized above and detailed in the findings below are clear. They show that, while plaintiff did indeed agree to a cancellation of its Ailor Avenue lease so that the lessor could then rent a portion of that property to Allied, simultaneously the lessor agreed that plaintiff should have the right to continue its occupancy of the Exchange Building so long as it had need therefor. They further show that, during the period involved, plaintiff did in fact use and occupy the building as its general executive and administrative offices. Defendant seemingly refuses to recognize that, during this period, plaintiff had in fact two offices, one in Knoxville and one in New Orleans. There is simply nothing in this record to warrant a finding that plaintiff intended in the fall of 1955 "irrevocably to discard" its right to use the Exchange Building. Treas.Reg § 1.167 (a)–8(a)(4). Far from that "actual physical abandonment" required by the regulation to support a write-off in 1955, plaintiff continued to use the building just as it always had. It is, therefore, entitled to the depreciation allowance which it claims.

But, says the defendant, the plaintiff has failed to prove entitlement to the deduction because it has not shown that it suffered the burden of any loss from depreciation of the building. In support of its contention, defendant refers to cases with two factual patterns. In the first, the taxpayer had no investment in the property. See, for example, Atlantic Coast Line Railroad Co. v. Commissioner of Internal Revenue, 81 F.2d 309 (4th Cir., 1936), cert. denied 298 U.S. 656, 56 S.Ct. 676, 80 L.Ed. 1382 (1936). In the second, although the taxpayer had such an investment, it had either been, or was in the process of being, reimbursed for its investment. See, for example, Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943).

Neither of these factual patterns, however, fits the present case. First, it is not disputed that the plaintiff had an investment in the property since it constructed the Exchange Building at an adjusted cost of $140,339.49, of which cost $124,752.36 remained undepreciated at December 31, 1955. Secondly, while defendant would dispute it, the plaintiff was never actually reimbursed for its remaining investment in the Exchange Building, as such. As stated above, plaintiff had agreed to the cancellation of the remaining term of its Ailor Avenue lease (eight and one-quarter years), provided it was paid $200,000 by Trustee over a ten-year period as consideration for the surrender of both its leasehold improvements (other than the Exchange Building) and of its favorable lease. The leasehold improvements in question, ex-

clusive of the Exchange Building had an original cost to plaintiff of about $200,000. Furthermore, in agreeing to the cancellation of its lease, plaintiff gave up its potential right to realize over $300,000 of rental income by itself subleasing the property to Allied for the remaining eight and one-quarter-year term. See The Trustee Corporation, 42 T.C. 482, 489, ftn. 2 (1964).

■ Therefore, if the plaintiff had not retained the right to use the Exchange Building for its general offices, rent-free, subsequent to December 31, 1955, the amount to be paid to it by Trustee could reasonably be expected to have been much higher than it was.[1] It is entirely unrealistic, therefore, to say as defendant does, that plaintiff had been "fully compensated" for its investment in the Exchange Building by its November 1955 contracts with Trustee and, hence, had no further depreciable interest in the building.

The defendant also contends that since plaintiff's entire Ailor Avenue lease was canceled as of December 31, 1955, plaintiff thereafter had no proprietary interest in the Exchange Building, but rather a mere license to use the building, which was not a sufficient interest to support a depreciation allowance.

■ It is true the entire lease was canceled, but simultaneously therewith, the parties agreed that plaintiff should have the right to continue to occupy the Exchange Building as long as it required such use. Standing alone, the fact that a lease is canceled may mean that the lessee thereupon loses his depreciable interest in leasehold improvements. However, as the Tax Court has consistently held, where a lease is canceled in favor of a new one, or is extended, the unrecovered cost of any leasehold improvements cannot be written off in the year of cancellation but must be recovered over the

useful life of the improvements or the term of the new or extended lease, whichever is shorter. See, for example, Gladding Dry Goods Co., supra; and Glenn-Minnich Clothing Co., Inc., 19 T.C.M. 1131 (1960).

Therefore, the fact that the entire Ailor Avenue lease was canceled must be considered in conjunction with the fact that there was a simultaneous agreement for continued occupancy of the Exchange Building. It has already been pointed out that the $200,000 consideration did not include payment for the Exchange Building. That improvement was segregated out and provided for in the simultaneous agreement which left the plaintiff with a sufficient continuing interest in the Exchange Building that it should be allowed to depreciate it.

■ The defendant points to the case of Washington Catering Co., 9 B.T.A. 743 (1927), where the lease provided that fixtures added to the leased premises by the lessee would become the property of the lessor should the lease terminate before its full term had run. The lease was subject to a continuing condition that the lessee be successful in its efforts to obtain and retain a liquor license, failing which the lessee had the option to terminate the lease. With the advent of prohibition, the lessee chose to cancel the lease, but it was agreed that the lessee would continue to occupy the premises from month to month for the same rent using the premises as a coffee shop and for the sale of soft drinks and tobacco. The taxpayers successfully contended that its unrecovered cost of improvements could be deducted in the year of cancellation. The Board of Tax Appeals felt that because the lessee thereafter occupied the premises at the sufferance of the owner and could therefore be dispossessed at any time, it should have the right to recover the unamortized cost of its leasehold improvements

---

1. Plaintiff would have been surrendering leasehold improvements having an original cost of about $300,000 with a depreciated cost of about $230,000, plus the opportunity to receive a vary substantial rental income from Allied for eight and and one-quarter years, all for the sum of $200,000.

upon cancellation of the lease. By contrast, in the present case, it cannot be said that plaintiff's occupancy of the Exchange Building was by sufferance of The Trustee Corporation or anyone else. It had the contractual right to remain there as long as it had need for the building.[2]

■ The Tax Court has made it clear in Millinery Center Building Corporation, 21 T.C. 817, 824 (1954), rev'd on other grounds, 221 F.2d 322 (2nd Cir., 1955), aff'd 350 U.S. 456, 76 S.Ct. 493, 100 L.Ed. 545 (1956), that a taxpayer-lessee is only permitted to write off its remaining unamortized cost of leasehold improvements where there is a cancellation of the lease plus "a complete surrender of possession thereunder to the landlords." Since the facts here clearly demonstrate that the plaintiff did not surrender possession of the premises, and did continue to have a substantial interest in the Exchange Building sufficient to support the claimed depreciation deduction, defendant's contentions are wide of the mark.

■ The defendant also urges that the plaintiff's use of the Exchange Building was only "nominal and artificial" and that, in fact, the building was used during the period in question primarily for the personal benefit of plaintiff's officers and shareholders rather than in the conduct of plaintiff's own business. While apparently admitting that plaintiff's general offices (at least, for accounting functions) were located in the Exchange Building, defendant points suspiciously to numerous business activities carried on by Guilford and Louis Glazer which were unrelated to plaintiff's business. It is difficult to discern the relevance of this fact to the issue at hand. Since plaintiff's general offices were admittedly in the Exchange Building, it would seem immaterial that two of its officials used their offices to conduct their own business ventures in addition to those of plaintiff. The record clearly shows that both Guilford and Louis Glazer were, in varying degrees, active in performing administrative and supervisory functions for plaintiff which would have required their access to its corporate records, nearly all of which were kept and maintained in the Exchange Building. That they were simultaneously performing services for other Glazer enterprises would seem to prove little other than that they were busy and energetic businessmen.

On the basis of the foregoing, it must be concluded that the plaintiff in fact continued to use and occupy the Exchange Building in its trade or business during the taxable period in question, and, therefore, is entitled to the depreciation deduction thereon which it now seeks.

### The Estoppel Issue

In its 1955 Federal income tax return plaintiff made no mention of any of the transactions whereby its Ailor Avenue lease was canceled in consideration of Trustee's payment to it of $200,000.[3] In its 1956 Federal income tax return, plaintiff claimed a loss for "leasehold improvements abandoned" as a consequence of the November 1955 agreements, and did not include any of its leasehold improvements

---

2. Defendant's suggestion that this contractual right arising out of an oral agreement was unenforceable under the Tennessee Statute of Frauds may, or may not, be true. Cf. Interstate Co. v. Bry-Block Mercantile Co., 30 F.2d 172 (W.D. Tenn., 1928). But the relevancy of the suggestion here is not at all apparent. This suit is not a contest between the landlord and the tenant, and in tax cases only the parties to the allegedly tainted contract may invoke the statute of frauds with respect thereto. See Mustard v. United States, 155 F.Supp. 325, 332, 140 Ct.Cl. 205, 216 (1957); Charlotte Union Bus Station, Inc. v. Commissioner of Internal Revenue, 209 F.2d 586, 589 (4th Cir., 1954) and J. N. Wheelock, 16 T.C. 1435, 1442 (1951).

3. The failure appears to have been due to plaintiff's original theory (now conceded to have been erroneous) that the cancellation took effect on January 1, 1956, and therefore constituted a 1956 transaction.

as depreciable assets or deduct any depreciation thereon. As to the taxable year 1955, plaintiff and the Government later entered into a binding statutory compromise which precluded both from making any further adjustments for 1955.

The Government contends that plaintiff's filing of its 1955 and 1956 Federal income tax returns constituted a request of the Internal Revenue Service to treat its November 1955 transactions in the manner therein indicated and a consent to the assessment and collection of the tax in that manner. Therefore, it says, plaintiff should be estopped from changing the position it originally took that, for tax purposes, it had disposed of its leasehold improvements as a consequence of the November 1955 agreements, because of an alleged double tax benefit which would otherwise be obtained.

In substance, the chronology of events is as follows:

June 15, 1956.—Plaintiff filed its 1955 Federal income tax return on which it reported no gain or loss from the lease cancellation agreement.

August 13, 1956.—Plaintiff submitted an offer in compromise of penalty for late filing of its 1955 Federal income tax return.

November 5, 1956.—Revenue agent's report on 1955 Federal income tax return completed, proposing additional tax which plaintiff later paid.

March 15, 1957.—Plaintiff filed its Federal income tax return for the period ended July 31, 1956, on which plaintiff claimed loss on write-off of leasehold improvements.

April 4, 1957.—Plaintiff's offer in compromise for taxable year 1955 accepted.

October 1958.—Plaintiff proposed to settle its 1955–1956 tax liabilities by paying capital gains tax on the $200,000 to be paid by Trustee, less a write-off of its leasehold improvements other than the Exchange Building, and that plaintiff be allowed depreciation deductions on the building for 1956 and subsequent years. Proposal rejected by Internal Revenue Service.

April 25, 1960.—Internal Revenue Service stated that plaintiff incurred a loss and not a gain as a result of the lease cancellation, such loss occurring in 1955, and not 1956. Therefore, since 1955 was closed by the compromise agreement, no refund allowable.

■ There are three essential elements to establish estoppel as to which defendant has the burden of proof. See Birkelund v. United States, 142 F.Supp. 459, 465, 135 Ct.Cl. 503, 513 (1956). First, a request by the taxpayer that the Commissioner of Internal Revenue treat a transaction in a given manner; second, agreement by the Commissioner to the taxpayer's request; and third, a change in the taxpayer's position in its return for a subsequent year at which time the Commissioner is precluded by the statute of limitations from assessing additional tax for the earlier year. See R. H. Stearns Co. v. United States, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647 (1934); Stern Bros. v. United States, 8 F.Supp. 705, 80 Ct.Cl. 223 (1934); Building Syndicate Co. v. United States, 292 F.2d 623 (9th Cir., 1961); and Akron Dry Goods Co. v. Commissioner, 18 T.C. 1143 (1952), aff'd 218 F.2d 290 (6th Cir., 1954).

■ As to the taxable year 1955, plaintiff did not write off the cost of the Exchange Building on its books or its tax return. Therefore, when the revenue agent examined these items, he could not have been misled into thinking that plaintiff no longer considered the Exchange Building as an asset of its business. As to the 1956 return, since this was filed after the revenue agent's report was filed, it would be impossible for the agent to have relied on anything contained therein.

The agent conducted his examination in plaintiff's offices in the Exchange Building and well knew that plaintiff was continuing to occupy the building. He

also knew that the plaintiff no longer leased the Ailor Avenue plant property, but was using the Exchange Building only for its general offices. From the facts available to him, it is safe to say that the revenue agent was apprised of all the relevant facts concerning the 1955 lease agreements. With this knowledge, the Government accepted plaintiff's offer of compromise of a penalty for late filing of its 1955 Federal income tax return and cannot say that, in doing so, it was in any way misled. See Ross v. Commissioner of Internal Revenue, 169 F.2d 483, 495, 7 A.L.R.2d 719 (1st Cir., 1948).

A further requirement for the invoking of estoppel is that the Commissioner had agreed with, or acquiesced in, the taxpayer's treatment of the item in question. Stern Bros. v. United States, supra. In this case, however, the Commissioner did not acquiesce in the manner in which plaintiff treated the transactions on its tax returns.

 Plaintiff, it is true, claimed a loss on its 1956 tax return as a result of the write-off of its leasehold improvements, *but the Service disallowed the loss.* As to 1955 the taxpayer asserted no gain or loss on the lease cancellation transactions. By 1960 the Internal Revenue Service had reversed the earlier position taken by its examining agent [4] and determined that plaintiff's loss had occurred in 1955 but added that no refund was possible due to the prior compromise agreement of penalties for that year. Therefore, since the Internal Revenue Service never agreed with the plaintiff's treatment of the transactions either on its 1955 or 1956 returns, the defendant cannot establish the elements necessary for the application of an estoppel. Cf. Stern Bros. v. United States, supra.

Accordingly, plaintiff is entitled to recover with the amount of recovery to be determined pursuant to Rule 47(c).

---

4. With full knowledge of the facts, he had asserted that no write-off was available to plaintiff during the periods involved because plaintiff had not abandoned the Exchange Building and, therefore, must

continue to recover its unamortized cost through the annual allowances for depreciation. Essentially, this is plaintiff's position here. See findings 26, 27, and 28, infra.