**BUILDING SYNDICATE CO., Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 17037.**

United States ·Court of Appeals
Ninth Circuit.

July 31, 1961.

Thomas B. Stoel, George H. Fraser, David G. Hayhurst and Hart, Rockwood, Davies, Biggs & Strayer, Portland, Or., for appellant.

Abbott M. Sellers, Acting Asst. Atty. Gen., Lee A. Jackson, I. Henry Kutz, Kenneth E. Levin, Dept. of Justice, Washington, D. C., and C. E. Luckey, U. S. Atty., Portland, Or., for appellee.

Before ORR, HAMLEY and HAMLIN, Circuit Judges.

ORR, Circuit Judge.

Appellant seeks to recover federal income taxes paid for the calendar year 1953 in the amount of $23,669.38, on the ground that it should be allowed additional depreciation deductions on certain real estate that it owns.

In 1927 the Northwestern Bank Building in Portland, Oregon, was owned by the Northwestern National Bank of Portland (hereafter "Northwestern"). During the year 1927, Northwestern offered this building for sale through one George N. Block, a real estate broker. Block paid Northwestern $10,000 for an option to purchase said property for $2,-202,133.07. Block thereafter acquired a financial commitment from George W. York & Company, Inc., (hereafter "York"), of Cleveland, Ohio, to underwrite an issue of land trust certificates for $1,250,000, said certificates to represent the equitable title to the property. York in turn persuaded the Union Trust Company of Cleveland to issue such land

trust certificates and act as trustee for the certificate holders. Since legal restrictions did not permit a Cleveland banking institution to hold real estate outside of Ohio, Union Trust Company associated the Security Savings & Trust Company of Portland, Oregon, with it to act as co-trustee and holder of the legal title, though it appears that Security Savings and Trust's actual interest was negligible.

In the meantime Block and others organized Building Syndicate, an Oregon corporation and the predecessor of appellant. The organizers subscribed to the corporation's entire authorized capital stock of $300,000, Block assigning the option to the corporation in part payment for his stock. The directors of Building Syndicate negotiated a commitment from the Lumberman's Trust Company to underwrite $750,000 of leasehold bonds which Building Syndicate planned to issue.

Finally all these dealings culminated in a large, complicated escrow transaction. As a result of this transaction the following events occurred:

(1) Northwestern conveyed the Northwestern Bank Building property to Security Savings & Trust Company.

(2) Northwestern received in payment $2,202,133.07. $1,250,000 of this sum came from the Trustees for Land Certificate Holders, the proceeds of the sale of 1350 land trust certificates. The remaining $952,133.07 came from Building Syndicate; part of this money came from the sale of leasehold bonds and the remainder from the original stock subscriptions.

(3) Union Trust Co. and Security Savings & Trust Company as cotrustees executed an agreement and declaration of trust between themselves and "The Holders of Land Trust Certificates of Equitable Ownership in the Northwestern Building Site."

(4) Security Savings & Trust Company, as holder of the legal title, and Building Syndicate entered into an "Indenture of Lease" whereby Security leased the Northwestern Bank Building property to Building Syndicate. The lease was for 99 years, renewable at the lessee's option, provided that if the lessee should fail at any time to perform any of its covenants or agreements for 60 days after notice of breach and the lessor's intention to terminate, all rights of the lessee under the lease would expire at the lessor's election. The lease required the lessee to pay a yearly rent amounting to 5½% of the principal amount invested by the land trust certificate holders. It gave the lessee the right to all income from the premises and it required the lessee to keep and maintain all buildings and improvements in good condition and repair, insuring them and paying all taxes, etc.; to replace any buildings removed or destroyed; and to pay all charges and expenses of every kind, character or description incurred by the lessor-trustee in connection with operating the trust and the leased premises. The lease also required yearly payments of $6,750 for the first ten years and thereafter $10,000 into a "Depreciation Fund" until such time as the funds paid in plus the interest earned on them equals $1,200,000. If at any time the lease should terminate, either by the total period elapsing or by a breach of covenant by the lessee, the amount in the fund was to pass to the lessor as recompense for anticipated depreciation in the value of the leased premises and the improvements thereon. The lease also gave the lessee an option to purchase the fee simple title to the premises at any time upon the payment of a certain sum, and in the event the lessee elects to do so it could apply the amount in the Depreciation Fund to the purchase price.

Building Syndicate entered into possession of the leased premises under this lease and changed the name of the building to the American Bank Building. In 1932 the leasehold bonds which Building Syndicate had issued went into default, and eleven years later, the bonds still being in default, the bondholders foreclosed. On November 9, 1944, a new corporation

known as Building Syndicate Company, the appellant herein, was organized. In a tax-free reorganization pursuant to the Internal Revenue Code all of the assets of Building Syndicate, including its lease on the bank property, were transferred to Building Syndicate Company (appellant).[1]

On October 31, 1945, appellant exercised the option to purchase included in the lease and acquired title to the property by paying the option price of $1,417,500. Of the funds used in this purchase, $1,200,000 was the proceeds of a loan from Prudential Insurance Co., $144,900 came from the Depreciation Fund, and $72,600 came from appellant's corporate funds.

In all of its tax returns from 1927 through 1943, Building Syndicate, appellant's predecessor, claimed that it was the owner of the bank building and took depreciation deductions based on the full value and estimated useful life of the building.[2] After the foreclosure by the leasehold bondholders the interim trustees and later appellant continued to take depreciation on an ownership basis. Under these methods appellant and its predecessor through October 31, 1945, took depreciation deductions in the total amount of $549,215.08, whereas as lessees amortizing a 99 year lease they could only have taken deductions in the amount of $172,272.65. Of the $376,942.43 difference, about two-thirds resulted in no tax benefit, occurring in loss years. When appellant exercised the option to purchase on October 31, 1945, it proceeded to allocate the $1,417,500 option purchase price between the building and the land and to claim depreciation on the new increased basis of the building from then on. Its theory was that it had not really been the owner of the property before and as the new owner it was entitled to amortize (depreciate) the amount it had just paid to acquire ownership of the wasting assets. The Commissioner of Internal Revenue refused to allow the added depreciation.

The Government's theory is that appellant and its predecessor, were in fact the owners of the property from 1927 on, for tax purposes at least, even if not for other purposes, and that the land trust arrangement was really only a mortgage or a loan which was repaid in October of 1945.[3] The Government endeavored to establish their case by introducing the tax returns filed by appellant and its predecessor, and also the predecessor's corporate minute-books and annual accounting reports which refer to it as owning the property. Appellant countered by calling two witnesses, one an officer of both appellant and its predecessor, and the other the former Vice President of the now defunct Union Trust Co., the person who investigated, recommended and negotiated the 1927 transaction for the trust companies; both witnesses testified that it was the true understanding of the parties to the lease that it was in fact a lease; that the Trust Company owned the premises in fee and did not merely take title as security for a debt, and that appellant and its predecessor had nothing more than a lease with option to purchase, subject at all times to being dispossessed for any failure to comply with all covenants in the lease. In addition there was testimony that at one time the trustee did start proceedings to cancel the lease but was persuaded by appellant's predecessor to abandon these proceedings.

---

1. The parties apparently agree that under the circumstances appellant stands in the same position as Building Syndicate for the purposes of this case, so that the fact of their separate identities is immaterial for purposes of the issues presented here.

2. By way of contrast, had it represented itself as merely a lessee which had made a $952,133.07 lump sum investment in a 99 year lease, it would only have been able to amortize this lesser sum over the 99 year period, which would have resulted in much smaller deductions than were actually taken.

3. Of course if this is so, the repayment of the loan would furnish no grounds for increasing the basis of the property.

The trial court found that appellant and its predecessors were owners of the property during the years in question at least for "tax purposes." There is a serious question on this record as to whether the appellant can be said to be "owner for tax purposes," but we have concluded that we need not reach that finding.

At the oral argument the government disclaimed an intention to rely on estoppel because it felt it had not pleaded that defense. However, an examination of the record discloses that in presenting the issues in the pre-trial conference, the government did present the question to the extent of a quasi-estoppel at least.

The trial court's pre-trial order provides that "the said pre-trial order supersedes all pleadings;" then in said pre-trial order it is stated, among other contentions of the government, that, "The closing agreement executed by Building Syndicate (old company) on February 26, 1929, and accepted by the Secretary of Treasury on or about May 24, 1929, bars Building Syndicate Co. (new company) from changing the basis upon which depreciation was claimed and allowed on the Northwestern (American) Bank Building." Thus, the taxpayer had ample notice of the elements of the contention it was called upon to meet.

Having received a tax benefit over a period of 18 years by its assertion of ownership, appellant should not now be permitted to receive a further very substantial benefit by changing its position.

In the case of R. H. Stearns Co. v. United States, 1934, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647, the Supreme Court of the United States has pointed up the test to be applied:

"Sometimes the resulting disability [to assert a position inconsistent with one's own act] has been characterized as an estoppel, sometimes as a waiver. The label counts for little.

Enough for present purposes that the disability has its roots in a principle more nearly ultimate than either waiver or estoppel, the principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong." 291 U.S. at pages 61–62, 54 S.Ct. at page 328.

And this court has had occasion to pass approvingly on the doctrine in Tozzi v. Lincoln Nat. Life Ins. Co., 9 Cir., 1939, 103 F.2d 46:

"This class of estoppel is sometimes expressed in the language of the rule or maxim that one cannot blow both hot and cold. It is based upon the broad equitable principle which courts recognize, that a person, with full knowledge of the facts, shall not be permitted to act in a manner inconsistent with his former position or conduct to the injury of another. To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself * * *" 103 F.2d at page 52.

See also Alamo Nat. Bank v. C. I. R., 5 Cir., 1938, 95 F.2d 622, wherein it is said:

"It is no more right to allow a party to blow hot and cold as suits his interests in tax matters than in other relationships. Whether it be called estoppel, or a duty of consistency, or the fixing of a fact by agreement, the fact fixed for one year ought to remain fixed in all its consequences, unless a more just general settlement is proposed and can be effected." 95 F.2d at page 623.

See also Stone v. White, 1937, 301 U.S. 532, 535, 57 S.Ct. 851, 81 L.Ed. 1265, for the equitable nature of a suit for tax refund.

Affirmed.