Davis, Judge,
delivered the opinion of the court:
A contractor with the Bureau of Ships of the Navy Department sues for extra work performed under its contract. The parties agree that the work was done and would normally be compensable under the changes article. The single defense to payment is that the contractor while seeking extra-contractual financial relief from the Navy — in the course of performance, and before the present contractual claims had been administratively determined — induced the Navy to grant an adjustment as of grace by representing that no further legal claims of the kind now pressed would be presented. The Trial Commissioner’s findings, which we adopt (with one change in finding 19), show that the evidence does not support this defense. It must therefore be rejected.[1]
In June 1952 plaintiff entered into a contract with the Bureau of Ships to construct twelve diesel wood patrol boats, to be completed by September 30, 1954. During performance in 1953 and 1954, work was ordered by the Bureau which plaintiff deemed beyond the requirements of the contract, but in accordance with the accepted procedure it performed the additional work, incurring increased costs. *3 Bequests for extra compensation (under the standard changes article of the contract) were made for some of these additional items before the end of May 1954; as to others the requests were made thereafter and in some instances not until the early part of 1956, considerably after the completion of all work in December 1954. There is no doubt that the work was actually done.
Toward the close of May 1954, plaintiff, which was then performing for the Navy a contract to construct five steel barges as well as the patrol boat contract on which its present petition is grounded, told the Bureau of Ships that it was running into very heavy losses and would not be able to complete its Navy obligations without substantial financial assistance. The Bureau suggested that the plaintiff apply for extra-contractual help under Title II of the First War Powers Act which permitted the defense agencies to amend contracts so as to increase the prices, without consideration from the contractor, where that was necessary to aid the defense effort. Programs and procedures had been developed by the agencies during World War II for considering requests for relief under Title II,[2] and in modified form these continued after the close of the war. In the Navy, in 1954, definitive action on such requests was taken by the Contract Adjustment Board, but the operating bureau concerned with the contract first reviewed the request and made recommendations to the Board.
On May 31, 1954, plaintiff filed an elaborate request for First War Powers Act relief on both of its contracts, “in a sum not to exceed $506,657.13.” This request dealt with the possibilities of other sources of further financing and specifically referred to anticipated increases in contract prices, through change orders, of “perhaps $85,000.00.” See findings 18,25. Thereafter, plaintiff’s vice-president, Starr, had a conversation with a representative of the Bureau of Ships (Lucisano) directed to the contractor’s statement that official *4 change orders still to be finally adjudicated, along with requested change orders not yet acted upon, totaled “perhaps $85,000.00.” The Navy desired to know more about this sum because any monies which could be expected to be due under the contract would reduce (or perhaps obviate) the need for financial relief as a matter of grace. In explaining the makeup of the $85,000, Starr did not mention most of the items now in suit but he did say that the contractor would continue to press certain unspecified requests for change orders which the Bureau had refused to approve; that other requests were still pending at various stages; and that the contractor intended to file in the future further requests for change orders. On this basis Starr expressed the belief that plaintiff was entitled to at least $85,000. See finding 19.
The Bureau did not rest on the plaintiff’s own estimates of costs, losses, and amounts probably payable on outstanding claims for changes, but made its own investigations and exercised its own judgment. On the basis of the information submitted by the plaintiff and obtained through its own inquiries, the Bureau proposed and forwarded to the Contract Adjustment Board, on August 18, 1954, its detailed analysis of the plaintiff’s request for First War Powers Act relief, together with the recommendation that a total (on both Navy contracts) of only $125,000 be granted. Supplementary statements of facts and recommendations were transmitted by the Bureau to the Board early in September 1954. The Bureau’s presentation did not at any time say that plaintiff had no further claim for additional costs or would have no further claims.
The application for relief was then reviewed by the Technical Assistant to the Contract Adjustment Board who suggested that a total of only $65,000 (apparently thereafter reduced to $58,000) be allowed.[3] The Board considered the request at a meeting on September 2, 1954, which was not attended by any representative of the plaintiff (although it had been advised that one could be present).
The Adjustment Board, on September 8,1954, authorized an increase (without consideration) of the total price of both *5 contracts by $74,000, the amount the Board considered sufficient to enable the plaintiff to complete its two Navy contracts. The Board’s opinion discussed various pertinent considerations but did not refer to any representation by plaintiff as to the extent of possible legal claims for contract changes. About ten days later, the plaintiff, insisting that the amount awarded was inadequate and based on erroneous assumptions and calculations, requested an additional increase of $82,473.14. On October 5,1954, the Board authorized a further increase of not to exceed $45,000. Again, the written explanation of the Board’s decision did not rely on any representations by plaintiff as to amounts recoverable under possible change orders.
With the aid of this relief under the First War Powers Act plaintiff completed its work on the patrol boat contract on December 24,1954. It continued to present and the Navy to process — before, during, and after the period in which its request for extra-contractual relief was being considered— various requests for extras and changes under the two contracts it was performing. Some of these requests were granted and some denied, but all were considered on their merits. With respect to such claims presented or urged in the years 1954 through 1957, the Bureau did not at any time take the position that plaintiff had estopped itself by representations made when it applied in 1954 for a First War Powers Act adjustment.
In the early part of 1956, over a year after completion of the patrol boat contract, plaintiff submitted to the contracting officer, under the disputes clause, consolidated claims covering the items for which compensation is now sought.[4] In March 1958, the contracting officer found that plaintiff had performed all except one of these items of extra work at Bureau direction and at an increased cost of $52,009.30. He rejected one item, the “as-constructed” drawings, as not extra work. He refused, however, to issue change orders compensating plaintiff for any of the extra work because, in his view, *6 the plaintiff had misled the Contract Adjustment Board by representing that there would not be any claims for extras or changes under the contract “other than the minor matters expressly referred to in the presentation of its claim, [i.e., the request for relief under the First War Powers Act].” On appeal, the Armed Services Board of Contract Appeals decided, on the Government’s concession, that the contracting officer erred in rejecting the “as-constructed” drawings as extra work, but the Board declined, because the question was not one of fact under the disputes clause, to take jurisdiction of the estoppel issue on which the contracting officer had refused payment for the extra items otherwise concededly payable under the contract.
On these facts, the plaintiff is entitled to recover $59,408.01 under its patrol boat contract — $52,009.30 on the items found by the contracting officer to be extras and $7,398.71 on the item for “as-constructed” drawings so found by the Board of Contract Appeals[5] — unless the Government has maintained its affirmative defense that plaintiff misled the Navy in connection with the grant of relief under the First War Powers Act. The evidence shows that the defense has not been sustained on this record. We have concluded, with the Trial Commissioner, that (finding 36) :
The record does not establish that the [Navy Contract] Adjustment Board acted upon any alleged representation made by the plaintiff on or about May 31,1954, to the effect that plaintiff did not have and would not have in the future any further claims for additional costs under the contract, when granting increases in the contract price without consideration.
Plaintiff’s initial written application for a noncontractual adjustment may have given the impression that the company’s anticipated claims under its contracts would total only about $85,000 (a sum which would exclude most, if not all, of the present items). But, as we have pointed out, it was thereafter made clear, during the processing of the application, that plaintiff was not precluding itself from filing *7 additional requests or from pressing requests already made; [6] and the plaintiff did not make any statement, after its first written application for First War Powers Act relief, that did or could lead the Navy to believe that such additional requests would not be filed or pursued.
Moreover, in considering the application, the Navy did not rely on plaintiff’s statements relating to its claims for changes or extras. These matters the Navy studied for itself, and it also decided for itself what account to take of possible future increases in contract prices due to changes and extras. See findings 20, 21, 24-25, and 36. There was no indication, as consideration of the Title II application progressed, that plaintiff was under an obligation to specify all the requests for changes it would eventually file. So far as the record shows there was no real reliance by the Navy upon the plaintiff’s affirmative “representations” as to changes or extras, or its omissions, which the defendant now stresses as misleading. Bather, the course of the Navy’s dealings with plaintiff’s contracts in 1954 and 1955 is consistent only with our findings that the Government was not deceived or led into error. In those years, the Bureau of Ships considered on their merits a number of plaintiff’s claims for extra compensation under the contract, both while its application for First War Powers Act relief was pending and after it had been granted its adjustments; several of these claims were allowed and paid. If the Navy believed that the contractor was prevented by the application or the awards under the War Powers Act from prosecuting any claims for extras or changes other than those specifically referred to in the course of its request for Title II relief, the Bureau would not have passed upon the merits of these later claims. Significantly, it was not until 1958, about two years after plaintiff had filed its formal consolidated claim for the items involved in this action, that the Bureau first raised the point (when the contracting officer denied the claims) that the plaintiff *8 bad made and was bound by disqualifying misrepresentations.
In tbe absence of purposeful or negligent misstatements or omissions by plaintiff upon which the Navy reasonably relied to its detriment or which misled it, there can be no basis for a defense of estoppel. See Birkeland v. United States, 135 Ct. Cl. 503, 513; Dee Hong Lue v. United States, 150 Ct. Cl. 655, 663, 280 F. 2d 849, 854; Ralston Purina Co. v. United States, 75 Ct. Cl. 525, 530-1, cert. denied, 289 U.S. 732; Mahoning Inv. Co. v. United States, 78 Ct. Cl. 231, 245-247, cert. denied, 291 U.S. 675. That necessary foundation, as we have shown, is lacking here.
Since estoppel is the only defense asserted in this court, and there is no other reason barring plaintiff from recovering under the contract, it is entitled to prevail. The additional work was performed. Agencies of the Defense Department — the contracting officer and the Board of Contract Appeals — have found that this work was properly compensable (aside from estoppel) under the changes article of the contract. The defendant does not now contest those factual determinations.
Judgment for the plaintiff will be entered in the sum of $59,403.01.
It is so ordered.
Dukpee, Judge; Laeamoios, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
PINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff is a New York corporation with its principal office and place of business at 123-45 Lax Avenue, College Point, Long Island, New York.
2. On or about June 30,1952, plaintiff entered into a contract designated NObs-3226 (hereinafter referred to as the “contract”) with the Department of the Navy, Bureau of Ships (hereinafter called the “Bureau”) for the construction and delivery to the Army Transportation Corps, at Charleston, South Carolina, of twelve 63-foot diesel wood patrol *9 boats. The contract was amended from time to time during the period, between December 8, 1953, and March 31, 1955, by agreement of the parties. The original contract price was $72,750 per boat, or a total of $873,000.
3. During plaintiff’s performance of the contract in the years 1953 and 1954, work was accomplished at the direction of the Bureau in addition to work which plaintiff was required to perform under the terms and specifications of the contract, and plaintiff incurred certain increased costs in the performance of such additional work.
4. Military Specification MIL-B-11790(TC) provided, in part, as follows:
Section 2 “Applicable /Specifications, Standards, Drawings, and Publications'1'1
Section 2.1 “The following specifications and drawings of the issue in effect on the date of invitation for bids, form a part of this specification.” Under the title “Military” Specification “MIL-D-11464” is indicated as being titled “Drawings and Technical Data for Transportation Corps Equipment,” in which data relating to responsibility of “As Constructed” drawings is indicated as follows:
Section 1 “Scope’’’
Section 1.1 “This Specification covers the preparation and approval of the following types of data furnished to Government by the contractor for marine equipment (vessels, barges, tugs, floating cranes, etc.) railway equipment (locomotives, railway cars, railway cranes, work equipment, etc.), and other major items of equipment used by the Transportation Corps:
Machinery and equipment lists
Shop Drawings
“As Constructed,” data
Inventory
Instructions Books
Photographs
Index of the above mentioned data.”
Section 3.3 “As Constructed Data. — ‘As Constructed’ data, consisting of reproducible copies of the machinery and equipment list, the shop drawings and any bills of material or related data whose approval was required in conformance with 3.1 or 3.2 shall be delivered to the contracting officer.”
*10 [Section 6.3] “Technical data. — The contracting officer should arrange to have the following data placed in the locker in the pilot house:
a. Specifications. — One copy of this specification, including any applicable amendments.
b. Drawings. — One print of each ‘as constructed’ drawing, and of each Transportation Corps drawing listed in 2.1, if used without change.
c. Equipment Usts. — One copy of each ‘as constructed’ bill of material, if separate from drawings, and of the inventory required by Specification MIL-D-11464.
d. Log of trials. — One copy of the log of trials specified in 4.1.”
5* Article 2 of the General Provisions of contract NObs-3226 provided as follows:
2. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shah be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
6. Article 12 of the General Provisions of Contract NObs-3226 provided as follows:
*11 12. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 80 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
7. During plaintiff’s performance under the contract, the Bureau took the position that certain work performed by plaintiff at the direction of the Bureau was not in addition to or outside the scope of work plaintiff was required to perform under the contract. Accordingly the Bureau refused to compensate plaintiff for such work.
8. On or about January 17,1956, and pursuant to the disputes clause of the contract, plaintiff submitted to the contracting officer a consolidated claim requesting a decision as to the disputed questions of fact relating to specified items of work performed by plaintiff at the direction of the Bureau with a specific finding as to whether such items constituted extra work beyond the contract requirements and the value or cost of such items.
9. On or about March 10, 1958, the contracting officer decided, pursuant to the disputes clause, that plaintiff performed work in excess of the requirements of contract NObs-3226 at the direction of the Bureau at a cost of $52,009.30, summarized as follows:
*12 Item Amount
1 246. 00
room blowers]_ 843. 60
666. 09
415. 49
on room machinery]_ 019. 24
[electric tachometers]_ 792. 02
[exhaust lines]_ 2, 466. 96
and of electrical installation]. 350. 00
costs in 377. 70
additional electrical 361. 92
plan discrepancies and inadequacies]_ 11, 000. 00
clerical 1, 293. 00
cuprinol treatment]_ 7, 608. 62
electrical 837. 24
additional mushroom ventilator]_ 519. 36
[insulation of tanks]_ 1, 302. 52
iron 324. 60
water 328. 00
10K [installation of electric cable]_ 865. 60
10L plates]_ 2, 534.
XOM [economy run]_ 856.
Total_ 52, 009. 30
Plaintiff has sued for the sum of $52,009.30 in Count I of its petition.
10. On or about March 10, 1958, the contracting officer further decided, pursuant to the disputes clause, that the preparation of so-called “as-constructed” drawings by plaintiff at the direction of the Bureau was not extra work beyond contract requirements, and, accordingly, the contracting officer did not compute the cost incurred by plaintiff in the preparation of as-constructed drawings. Plaintiff sues for the reasonable value of preparing as-constructed drawings in Count II of its petition (see finding 14).
11. In support of his decision of March 10,1958 (findings 9 and 10), the contracting officer directed that plaintiff should not be compensated in the amount of $52,009.30 for extra work performed and that no change order would be issued for the following reasons:
Prior to the filing of the Consolidated Claim the contract price of Contract NObs-3226 had been increased by Amendments Nos. 10 and 14 in amounts totalling $119,000. [Amendment No. 10 authorized the contractor, however, to make payments out of the price increase granted therein toward the completion of Contract NObs-5606.] These price increases were granted to the Contractor upon its application to the Bureau and upon authorization by the Navy Contract Adjustment *13 Board as amendments without consideration under Title II of the First War Powers Act. From the record of the administration of Contract NObs-3226 it would appear that as of 31 May 1954, the date of the Contractor’s initial application for Title II relief, the Contractor was or should have been aware of the facts on which the Consolidated Claim is based, of the additional costs, if any, incurred as a result thereof, and of their import in the administration of the Contract, since at that time the Contractor had delivered four of the twelve patrol boats to be delivered under the Contract and had accomplished 80 to 99 percent of the progress on the remaining eight vessels. Accordingly, the Contracting Officer finds that (1) the alleged changes involved in the Consolidated Claim had been made prior to the submission of the Contractor’s application for Title II relief, (2) prior to such time all of the alleged extra work had been performed in regard to the four vessels already delivered and that the alleged extra work had very substantially been performed in regard to the eight vessels not yet delivered, and (3) the Contractor knew or should have known on or before 31 May 1954 of such alleged changes or extra work and of any claim to which they might give rise.
Nevertheless, the Contractor did not in its Title II claim or at any time prior to the execution of Amendment No. 14 (the second amendment to the contract increasing the contract price without consideration as a result of action bv the Navy Contract Adjustment Board) present the facts, upon which the Consolidated Claim is based. Piad the Contractor done so and claimed the adjustment in the contract price now requested in the Consolidated Claim, the amendments without consideration sought by the Contractor would not have been executed by this Bureau without prior determination of the alleged changes or extra work set forth in the Consolidated Claim. Far from then presenting such claim, the Contractor sought from the Government an increase in the contract price without legal consideration under the extraordinary authority of Title II of the First War Powers Act on the Contractor’s written representation made in the application of 31 May 1954 that “Sound believes it has exhausted all possible financial adjustment available under the contract.” Sound further stated that “All delay claims have been adjudicated, except for one * * * which Sound believes will not be granted * * *” and that “All change orders have been priced out, by Sound, and *14 final determination is awaited on those not yet settled by amendment, except for those which deal with things not to be known in advance, such as modifications to G.F.M. and trial board items.” After making the quoted statements, the Contractor applied for relief “through the last channel open to it,” i.e., Title II. It is clear from the foregoing, and the Contracting Officer’s findings, that the adjustments in the contract price of Contract NObs-3226 granted to the Contractor by Amendments Nos. 10 and 14 to the Contract pursuant to the authorization of the Navy Contract Adjustment Board under Title II of the First War Powers Act were granted to the Contractor on the presentation and in the mutual understanding that the Contractor did not have any claims to an increase in the contract price under Contract NObs-3226 as of 31 May 1954 other than the minor matters expressly referred to in the presentation of its claim.
Moreover, in the Bureau’s view, the Navy Contract Adjustment Board’s authorizations to grant the Contractor increases in the contract price without' consideration preclude this result. In these circumstances it would be contrary to the basis on which the Contractor was granted increases in the contract price of its contract without consideration and would in effect result in double payment, if the Contractor were now awarded a further increase in the contract price on account of alleged changes and extra work for which it had a claim at the time of filing its application for Title II and prior to Government action thereon. If the Contractor, however, desires that the Navy Contract Adjustment Board consider further its authorizations for amendments of the Contract without consideration in the light of the Consolidated Claim, presented after the Board’s decisions, the Contractor may submit any such request to the Bui'eau.
This is the final decision of the Contracting Officer. If this decision decides a disputed question of fact or is otherwise subject to the procedure of the Disputes clause contained in this contract, you may, in accordance with the provisions of such Disputes clause, appeal from this decision to the Secretary of the Navy. The notice of appeal must be in writing and the original with two copies must be mailed or otherwise furnished to the Contracting Officer within thirty days from the date of receipt of this decision. Such notice should indicate that an appeal is intended and should reference this decision and identify this Contract by number. The *15 Armed Services Board of Contract Appeals is the authorized representative of the Secretary of the Navy for hearing, considering, and determining disputed questions of fact or other disputes which are made subject to the procedure of the Disputes clause by contract procedure.
12. On or about March 26, 1958, plaintiff, pursuant to the disputes clause, duly appealed from the contracting officer’s decision to the Secretary of the Navy on the ground that the contracting officer’s decision was erroneous and unlawful in that (1) the contracting officer denied plaintiff compensation in the sum of $52,009.30 which he found to be the reasonable value of work performed by plaintiff at the direction of the Bureau in excess of contract requirements and (2) the contracting officer erroneously found that the preparation of as-constructed drawings by plaintiff at the direction of the Bureau was not extra work in excess of contract requirements.
13. On or about April 21,1959, the Armed Services Board of Contract Appeals, as duly authorized representative of the Secretary of the Navy, decided that, inasmuch as the Government had agreed in a prehearing conference that the preparation of as-constructed drawings was extra work in excess of contract requirements, and plaintiff concededly would be entitled to $7,292.62 for furnishing these drawings were it not for plaintiff’s receipt of Title II relief, the sole issue was the consequence of plaintiff’s receipt of Title II relief on its otherwise conceded contractual right to payment for extra work. The Armed Services Board declined to accept jurisdiction, because this was not a disputed question of fact within the meaning of the disputes clause, and dismissed plaintiff’s appeal for lack of jurisdiction. The Armed Services Board included in its opinion and finding, among others, the following paragraphs:
3. Inasmuch as the Government has agreed, in the course of a prehearing conference before a member of the Armed Services Board of Contract Appeals on 10 April 1959 initiated by the parties’ respective counsel for the specific purpose of suggesting a lack of juris-, diction on the part of the Board to consider and determine the instant appeal that, as concerns the $7,292.62 item of claim for “as-constructed” drawings, the contract *16 did not require the contractor to furnish such, drawings and that Appellant would be entitled such price adjustment to compensate it for furnishing the same were it not for the adjustment Appellant secured under Title II, the Board considers the issue now presented in the appeal to be the same in respect to both the $7,292.62 and the $52,009.30; namely, what consequence Appellant’s receipt of the Title II relief shall have upon Appellant’s otherwise conceded contractual right to an equitable adjustment in contract price for changed or extra work found to have been performed.
DECISION
4. The Board is of the opinion, as the authorized representative of the Secretary of the Navy, that this sole issue is one neither fairly to be regarded as a dispute concerning a question of fact arising under the contract appropriate for determination pursuant to the terms of the “Disputes” clause, nor one in respect to which we should feel impelled, in the exercise of the discretion granted us under our charter, to pass upon the legal question presented; a question, we are given to understand, now in issue in a pending court action. Cf. Shaw & Estes, ASBCA No. 2621, decided 21 February 1956. The instant withholding by the contracting officer of the price adjustment due Appellant on account of additional work found to have been performed, because of the price adjustment under Title II of the First War Powers Act theretofore received by Appellant, rests upon considerations not governed by the terms of the contract, and against the implementation of which considerations this Board does not have jurisdiction to grant relief, Delta Tank Manufacturing Company, Inc., ASBCA No. 3699, decided 28 June 1957, 57-1 BCA [Par.] 1341. Accordingly, and in keeping with the parties’ suggestion, the appeal is hereby dismissed.
Í4. Plaintiff incurred additional costs of $6,833.37 in preparing as-constructed drawings. The customary and reasonable rate of profit allowed to plaintiff under the contract for extra work was 8.2 percent of plaintiff’s costs, amounting in this case to $560.34. Accordingly, if recovery is allowed, it is found that the reasonable value of the extra work performed by plaintiff in preparing as-constructed drawings is the amount of $7,393.71.
15. In May 1954 plaintiff was engaged in performing two contracts with the Navy — the contract in suit herein and *17 contract NObs-5606 for the construction of five steel barges.
16. On May 21,1954, Roger Starr, vice president of plaintiff, conferred with Captain Vangeli, Director of Contracts, Bureau of Ships, and advised him that plaintiff was running into very heavy losses and would not be able to complete its Navy contracts without financial assistance because both plaintiff and Starr personally had exhausted their financial resources. Vangeli suggested that Starr see Lewis T. Harrison, and introduced Starr to Harrison. Harrison was assistant Director of Contracts, Contract Division, Bureau of Ships.
During the conversation between Starr and Harrison, Harrison took pencil notes, upon which he based a typewritten memorandum dated May 24, 1954, as follows:
1. On 21 May 1954, Mr. Starr of the Sound Shipbuilding Corporation visited the Bureau and discussed briefly with Captain Vangeli his financial difficulties in the performance of the subject contract. Captain Vangeli referred Mr. Starr to me for further discussion and during this discussion, the following information was developed.
2. Contract NObs-3226 covers twelve 63 ft. Patrol Boats, three of which have been delivered, three are completed, and six remain in various stages of completion, ranging from 60% to 90%. The completion date of this contract is scheduled for 30 September 1954.
3. Contract NObs-5606 covers five Steel Barges, two of which have been delivered, two are completed, and one is about 50% complete. The contract is scheduled for completion about 15 July 1954.
4. The contractor has a weekly operation requirement of $12,000, made up as follows:
$5,000 Commercial work
$4,000 Contract NObs-3226
$1,500 Contract NObs-5606
$1,500 Office help and other overhead items
5. The contractor has an outstanding accounts payable approximating $130,000, most of which is past due. The creditors will be satisfied if these bills can be reduced at the rate of $15,000 to $20,000 per month. The Cost Inspection Service audit indicates that a loss of $240,000 will be incurred on NObs-5606. The contractor estimates that the loss on NObs-3226 will be between $150,-000 and $175,000.
*18 6. His estimated cost to complete Contract NObs-5606 is $29,600, and NObs-3226 is $116,000, for a total cost of $145,600. According to the contractor, there remains to be paid under NObs-5606, $30,000 and under NObs-3226, $130,000. It will be noted from the above that there are sufficient monies in the contract to cover the cost of completion. However, the withholding of reserves will deprive the contractor of a substantial part of the remaining balance for immediate use. He has reached the point where he has no operating capital.
7. I informed Mr. Starr that the Bureau would review the situation with respect to the condition of the delivered boats, with the possibility that we may reduce the 2% withholding for the guarantee period, and that it may be possible to reduce the reserve for final settlement of the contracts. In this connection, Mr. Littlejohn and Mr. Bennett, the negotiators on these two contracts, have been requested to obtain the comments of the technical section in order that a decision can be made on the reduction in withholdings.
8. It was established during the discussion with Mr. Starr that there are no substantial amounts due under change orders, and that there is little likelihood of any increase resulting from delay_ claims. However, he was assured that we would expedite the handling of requests for change orders and the adjudication of outstanding change orders, and to act promptly upon any delay claim that may be submitted.
9. It appears that the contractor’s only hope for survival lies in his ability to obtain relief under Title II of the War Powers Act. In this connection, I arranged for Mr. Starr to talk with Mr. Weatherly, Code 1718.
Mr. Harrison sent copies of this memorandum to his subordinates : Mr. Littlejohn, negotiator of contract NObs-3226; Mr. Bennett, negotiator of contract NObs-5606, to check on the dollar amounts of the 2 percent withholdings and possible release thereof to plaintiff; and to Daniel E. Weatherly, Harrison’s assistant in direct charge of applications by Government contractors for awards under Title II of the First War Powers Act.
17. In accordance with the Bureau’s procedure, plaintiff requested compensation for extra work as follows:
(a) Plaintiff would submit a “request for change order” requesting that the Bureau agree to a formal change in contract requirements covering the extra work.
*19 (b) If tbe Bureau agreed, the Bureau would issue an “official change order” describing the extra work. The amount of the price increase to cover the extra work was not stated, in the official change order.
(c) Upon issuance of an official change order, plaintiff would “price out” the official change order by preparing and submitting to the Bureau plaintiff’s estimate of the cost of the extra work including an agreed profit factor of 8.2 percent.
(d) After receipt of plaintiff’s “pricing out” of an official change order, the official change order was “adjudicated” by negotiation between the Bureau and plaintiff to arrive at an agreed increase in the contract price to cover the cost of the extra work.
, (e) After adjudication of an official change order, the contract was formally amended to change contract requirements and increase the contract price in the agreed amount.
(f) Plaintiff was obligated to perform such work as directed by the Bureau. If the Bureau and plaintiff failed to agree as to any phase of the above-mentioned procedure, a dispute within the meaning of the disputes clause would exist.
18. Under date of May 31, 1954, over the signature of Roger Starr, vice president of plaintiff, plaintiff sent to the Bureau of Ships, Department of the Navy, attention of Mr. A. G. Lucisano, its typewritten application for financial assistance under Title II of the First War Powers Act, needed to complete both contracts NObs-3226 and 5606. The application commenced as follows:
I. Sound Ship Building Corporation is a contractor to the government under two contracts: NObs 5606, dated 7 June 1952, and NObs 3226, dated 30 June 1952. The contractor has suffered and will continue to suffer severe financial losses under both contracts. As set forth in the enclosures by Sound’s accountant, these losses amount to $214,922.13, as the estimated total loss under contract NObs 5606, and $326,926.58, as a total loss under contract NObs 3226. Official change orders still to be adjudicated, and requested change orders will, if granted, reduce this figure by perhaps $85,000.00.
In paragraph II, plaintiff asked for $506,657.13.
*20 In paragraph III, plaintiff described how it would apply the money asked for: (1) to pay an arrears of Federal income taxes of about $7,100; (2) to apply $25,000 to cash working capital; (8) to pay off trade creditors in the total amount of $122,816.78; (4) to retire banks loans in the approximate amount of $100,000; and (5) to retire subordinated liabilities representing cash advances by stockholders and others amounting to more than $234,185.93.
In paragraph IV, plaintiff gave a narrative of its history and business activities.
In paragraph V, under the heading, “Why should the Navy help Sound?” plaintiff made the following statement:
' Without a substantial amount of financial assistance Sound will probably be unable to complete contracts NObs 5606 and 3226, although it appears at this time as though the funds still to be derived from the contract will cover the cost still to be incurred. The reason for this is the substantial financial loss which has been absorbed to date by Sound’s creditors, including the government as tax collector. When the creditors lose patience, and these include not merely the trade creditors, but also the bank, and the owners of the subordinated liabilities, Sound’s operations will perforce stop. The creditors have already indicated their impatience, and while no suits have been started, due to the heroic efforts of Sound’s management, and the most stringent economy and strategic distribution of funds among the creditors, nevertheless without help, notes will fall due, and Sound will be unable to meet them; creditors will demand payment, and when they are not satisfied, will institute suit. The bank will refuse to renew its unsecured obligations. Operating without visible working capital, and with no reserves at all, Sound will be unable to survive the onslaught.
By private borrowing, by stringent economies, by its successful commercial operations, Sound has progressed in its contracts to a point of substantial completion. NObs 5606 calls for the construction of five steel barges. Two of these have been delivered, two more lie completed in the contractor’s yard. The fifth is on the ways, but cannot be launched nor moved at this time.
With respect to NObs 3226 which calls for the construction and delivery of twelve patrol boats, three have been delivered, two more have passed their preliminary acceptance trials and their delivery will be made when the Navy has resolved certain internal questions con- *21 ceming a change in propeller design. The sixth vessel has already been launched, and will, by the time this letter is read, have undergone its dock trials. The seventh and eighth vessels are ready for_ launching. Plumbing and machinery trades are at work in the ninth and tenth vessels. The hull and superstructure are complete on vessel number eleven. The hull of vessel twelve is complete, and the superstructure is under way.
Thus, there remain four vessels on this contract which can neither be launched nor moved at the present time.
To complete the vessels, after Sound’s force has been dispersed, at a new location with a new organization will surely cost the government greatly in excess of the monies still due under the contracts, namely $160,000. Sound’s financial condition at the present time makes it unlikely that these excess costs could be recovered from Sound in the event of a default.
There followed in the application several pages of argument respecting plaintiff’s production and superior qualities, with some conclusions as to how plaintiff got into its financial difficulties. As to the latter, plaintiff argued in its application that it accepted contract prices too low in amounts, combined with unforeseeable cost rises, at the same time acknowledging deficiencies in its management and unfamiliarity with Navy contract procedures.
Plaintiff concluded its application as follows:
YU. Has Soimd Exhausted All Other Possibilities For Help?
Sound believes it has exhausted all possible financial adjustment available under the contracts. All delay claims have been adjudicated, except for one, for which a change order has been requested, and which Sound believes will not be granted, based on the oral comments of the Supervisor of Shipbuilding, New York.
All change orders have been priced out, by Sound, and final determination is awaited on those not already settled by amendment, except for those which deal with things not to be known in advance, such as modifications to G.F.M. and trial board items.
All private sources of capital have been tapped to the bottom.
Sound, therefore, submits this appeal through the last channel open to it. It is the fervent hope of the writer that the government will find it possible to mitigate the losses to the extent that Sound can complete the con *22 tracts it now has in hand, and can continue in business to repair and construct floating equipment for private owners and for the Navy in the future.
With its application plaintiff enclosed the following:
1. Sound Ship Building Financial Statement as of March 81,1954.
2. Schedule of Trade Accounts Payable, as of April 30, 1954.
3. Schedule of Trade Notes Payable as of April 30,1954.
4. Exhibit “A”, Pro Forma Balance Sheet after projecting equalization of all losses.
5. Pro Forma Balance Sheet, Schedule No. 1.
6. Exhibit “B”, Contract NObs-3226, estimated profit and loss statement to completion (including only official amendments, without consideration of un-adjudicated change orders).
7. Exhibit “C”, Contract NObs-5606, estimated profit and loss statement to completion (including only official amendments).
No dollar amount of any pending change order, request therefor, or amendment was mentioned in any of plaintiff’s papers.
19. Mr. Lucisano received and read the application, and on June 7,1954, had a telephone conversation with Mr. Starr, of which Lucisano made a pencil memorandum. In the telephone conversation, Lucisano, referring particularly to plaintiff’s statement at the end of paragraph I of its application that official change orders still to be adjudicated and requested change orders totaled “perhaps $85,000.00,” told Starr that it was most important to resolve the dollar amounts of all claims plaintiff had against the Government, and to settle them immediately; and meanwhile, he (Lu-cisano) would recast plaintiff’s application by taking into account monies actually to be received from outstanding contract claims. Lucisano asked Starr of what the $85,000 consisted. Starr replied that under NObs-5606 plaintiff had requested change orders for extra welding of $5,000 and for a delay claim of $35,000, but that all issued change orders had been adjudicated; and Starr stated that under NObs-3226 change orders already issued — being Nos. 1 and 8 — but not yet adjudicated, would amount to $8,000 and $14,000, respectively; and that change orders to be requested would *23 amount to $2,300 for bilge and manifold work, $1,000 for extra clerical work, between $10,000 and $11,000 for design work and as-constructed drawings, and $2,500 for hull delays on one of the patrol boats. In this telephone conversation, Starr also estimated trial board items of $5,000 and $350, respectively, under change orders already issued — being Nos. 9 and 12. Starr stated that plaintiff had filed requests for change orders which the Bureau refused to approve; that the plaintiff believed these requests to be valid and would continue to press for their approval; that plaintiff had presently on file pending requests for change orders; that plaintiff intended to file in the future further requests for change orders; and that plaintiff was awaiting the adjudication of official change orders which had been priced out by plaintiff. It was from all these sources that Starr expressed the belief that plaintiff was entitled to at least $85,000.[7]
20. In determining plaintiff’s losses under its contracts, the Bureau did not accept plaintiff’s estimate, but relied upon its own investigation and estimates supplied by the Navy Cost Inspector, and relied upon estimates of the cost to complete prepared by the Supervisor of Shipbuilding and the Bureau of Ships. Similarly, the Bureau did not accept plaintiff’s estimate that adjudications of official change orders and requested change orders, if granted, would reduce plaintiff’s losses under its contracts by $85,000. The Bureau conducted its own investigation of plaintiff’s outstanding claims and relied upon the evaluation of plaintiff’s claims by Littlejohn and Bennett, the officials of the Bureau in charge of the respective contracts.
21. Mr. Lucisano discussed with Littlejohn, negotiator in charge of NObs-3226, the status of the current change orders requested. Littlejohn replied that the amounts of change orders 1, 8, and 9 had been agreed upon, with the result that amendments adjudicating the amounts were issued before Lucisano prepared a recommendation upon plaintiff’s application. With respect to the change orders to be requested for the bilge and manifold work, Littlejohn indicated that he would recommend the same, but the change *24 order for extra clerical work would be denied; the change order requested for design and as-constructed drawings would be denied, as it already had been three times before plaintiff’s Title II application; the delay claim of $2,500 would be denied for the reason that Bureau of Ships had already satisfied plaintiff’s claims for such delays by a payment of $75,000.
Lucisano also discussed with Mr. Bennett, the negotiator in charge of NObs-5606, the change orders Starr had requested of $5,000 for extra welding, and a delay claim of $35,000, part of the $85,000 of requested change orders mentioned in the last sentence of paragraph I of plaintiff’s Title II application. Bennett stated that those claims would be denied.
22. In the meantime, plaintiff had been requested to bring its balance sheets and financial statements, including change orders and amendments adjudicating the same, up to date from March 31, 1954, to May 31, 1954, the date upon which its Title II application of May 31, 1954, was predicated. Plaintiff complied, and the data reached defendant by June 30, 1954. Included therein was a financial statement referred to as “Schedule A-4,” containing plaintiff’s only mention of change orders and amendments thereto, for calculation into the contract price to be paid plaintiff “as amended at 21 June 1954” under the two contracts. Under NObs-5606 plaintiff added to the May 31, 1954, contract price of $299,290 change order 3 of $445 and change order 105 (modification 1) of $9,162, totaling $9,607; and subtracted therefrom change order 4 of $8,000, leaving a net addition of $1,607 and bringing the contract price under NObs-5606 to a total of $300,897. Under NObs-3226 plaintiff added to the May 31, 1954 contract price of $1,057,092.32 amendment 6 of $767, amendment 7 of $1,983, amendment 8 of zero dollars, and amendment 9 of $11,649, totaling $14,399, leaving a net addition of $14,399, and bringing the contract price of NObs-3226 to a total of $1,071,491.32.
23. Based upon the information and data submitted to him by plaintiff, the Government contract negotiators, and the cost inspector, Mr. Lucisano made a calculation of the additional fmids plaintiff would need to complete the contract. Only change orders 1, 8, and 9 had been adjudicated *25 at the time, totaling $19,954, i.e., the difference between the contract price of $98,710 remaining unpaid as of May 31, 1954, and the contract price of $118,664 remaining unpaid as of July 15,1954.
24. Lucisano prepared for Mr. Harrison’s signature, and for submission to the Navy Adjustment Board, a statement of facts and recommendations, attaching thereto copies of the contracts, a completion schedule of undelivered vessels and barges, the plaintiff’s application and attachments, and the Bureau of Ships’ letter and memorandum of estimated costs to complete the contract. The endorsement and statement were dated August 18, 1954, and transmitted from the Chief, Bureau of Ships, to the Chairman, Navy Contract Adjustment Board. Supplementary statements of facts and recommendations were approved and transmitted by Harrison to the Board mider dates of September 7 and 9, 1954. In none of these statements of facts or the data submitted over Harrison’s signature to the Navy Contract Adjustment Board at the time was it stated that plaintiff had no further claim for additional costs from the contract and would have none in the future.
The fiscal data respecting the actual losses and the prospective losses, upon which the Bureau of Ships based its recommendation, included the following:

Actual Losses as of SI May 1954

Total Costs Incurred as of 31 May 1954_ $1,678,169
Total Payments as of 31 May 1954 (including reserve) _ 1,296,348
Total Losses as of 31 May 1954_ 381,821

Prospective Losses as of SI May 1954

Total Costs to Complete as of 31 May 1954_ $176,472
Remaining Contract Prices as of 31 May 1954_ 98, 710
Total Prospective Losses_ 77,762
Subsequent to 31 May 1954 the “Remaining Contract Prices” were further increased by the adjudication of outstanding Change Orders. Thus, as of 15 July 1954, the total amount yet to be paid under both contracts was $118,664. This reduces the Prospective Losses to approximately $58,000, illustrated as follows:
Estimated cost to Complete as of 15 July 1954_ $176,472
Remaining Contract Prices as of 15 July 1954_ 118, 664
Total Prospective Losses as of 15 July 1954_ 57,808
*26 25. The recommendation of the Bureau of Ships to the Navy Contract Adjustment Board was as follows:
VII. Amoimt of Belief Requested by Contractor and the Amount Recommended by the Bureau of Ships
1. The Contractor, in his request for relief (Exhibit I>) states “The Contractor hereby appeals for such additional compensation, in a sum not to exceed $506,657.13, which represents the contractor’s actual out of pocket loss, incurred and to be incurred, under the subject contract (including general and administrative expenses, interest, depreciation, but without provision for loss of profit.”
2. The Bureau recommends that only $125,000 be granted. This recommendation is based principally on the theory that any amount greater than $125,000 would negate the principle of “substantial savings to the Government”, which is the basis for submitting this case to the Board. By the granting of $125,000 to the Contractor the Government will have saved approximately $100,000, or the difference between the excess cost ana $125,000. It is believed that the Contractor can complete both contracts with this recommended amount, although it will require further cash contributions from other sources. The Bureau arrived at $125,000 by adding to the prospective losses for the run-out of both contracts approximately 40% of the Pressing Current Liabilities listed on page 7 hereof, or
Total Prospective Tosses-$58,000
40% of Pressing Current Liabilities- 67,000
Total_ 125,000
3. In the event the Board grants the relief recommended, the Bureau will establish a controlled account similar to that suggested by the Board in the case of Island Dock, Inc.
4. The total amount recommended will be divided between the two contracts as follows:
NObs-3226_$105, 000
NObs-5606_ 20, 000
Total_ 125,000
26. Since $19,954 was all the money due plaintiff from adjudicated change orders, and since $98,710 was all the money considered by defendant to become due plaintiff from the contracts, the Bureau based its recommended award upon the total of those sums, $118,664, instead of the estimated cost to complete of $176,472.
*27 27. The Bureau’s recommendation was referred directly to Comdr. Thomas C. Mason, U.S.N., Technical Assistant to the Navy Contract Adjustment Board, the agency which operated under the provisions of Title II of the First War Powers Act and was empowered by the Act to make monetary awards without consideration. Commander Mason, after examination of plaintiff’s application and all of the other papers and exhibits annexed to the Bureau’s recommendation, together with some additional information obtained from plaintiff and the Bureau, bringing plaintiff’s future costs to complete the contracts, cash position and prospects through July 1954, prepared a memorandum dated August 25, 1954, for the chairman of the Board, Bear Admiral Frank Baldwin, now deceased. In this memorandum Commander Mason suggested that, instead of the price increase in the amount of $125,000 recommended by the Bureau, the contract price of both contracts should be increased by only $65,000, for the reason that plaintiff had available at that time over $196,000 from accruing payments under the contracts and the adjudication of change orders, of which $67,000 would retire urgent past-due payables and $129,836 would provide working capital to cover run-out costs, primarily labor costs.
28. On or about August 29, 1954, Starr furnished Commander Mason with a typewritten summary, prepared by plaintiff’s accountant, of trade accounts, some settled, some in dispute, and the remainder accrued but not billed, showing an increase in accounts payable of over $21,000, bringing total accounts payable to over $117,000, items payable that could not be deferred of over $94,000, and items which could be deferred of over $58,000. This financial statement scheduled accounts payable as of July 31, 1954, of approximately $99,000, and trade notes payable of more than $23,000. It also scheduled the August, September, October, and November maturities of additional trade accounts payable.
29. On August 30, 1954, Starr called Commander Mason to ascertain if plaintiff’s additional trade account material was before the Board, and, after being answered in the affirmative, he was informed that a Board meeting was scheduled for 2 p.m., September 2, 1954, to consider plain *28 tiff’s case, at which. Starr was advised he might be present if he so desired.
The meeting was held as scheduled to consider plaintiff’s request for Title II relief under both contracts, but Starr did not attend. Those present were Bear Admiral Baldwin, chairman; Mr. Goodwyn; Commander Mason; John Green from the office of the General Counsel, Department of the Navy; representatives of the Bureau of Ships, including Messrs. Hecht and Weatherly; and a representative of the Army Transportation Corps. A typewritten memorandum of the meeting of September 2, 1954, was prepared and signed by Bear Admiral Baldwin and Mr. Goodwyn. Commander Mason presented the posture of the case to the Board, with all papers received from the Bureau of Ships and additional papers meanwhile brought in by Starr. The difference between the Bureau’s recommendation of an award of $125,000 and Commander Mason’s recommendation of $58,000 was discussed. The Bureau had used estimates as of May 31, 1954, whereas Commander Mason had brought his estimates up to date as of the meeting.
30. On September 8, 1954, the Adjustment Board, acting pursuant to Title II of the First War Powers Act as amended and administrative regulations issued thereunder, authorized an amendment without consideration of the contract in suit herein increasing the price by $74,000. The basis for the authorization was stated by the Adjustment Board as follows:
PACTS DEVELOPED
2. Contract NObs-3226, awarded by the Bureau of Ships to the subject contractor through competitive negotiation on 30 June 1952, provides for the construction of twelve 63-foot diesel wood patrol boats at a fixed unit price of $72,750 at a total fixed contract price of $873,000. Deliveries were to be made at the rate of two vessels per month beginning April 1953 and ending 30 September 1953.
3. Contract NObs-5606, awarded by the Bureau of Ships to the subject contractor through competitive negotiation on 7 July 1952, provides for the construction of five 120-foot steel decked cargo barges at a fixed unit price of $58,830 or at a total fixed contract price of $294,150. Delivery of the first barge was to be made in *29 October 1952 and two barges per month were to be delivered in November and December 1952.
4. As of 25 June 1954, the contractor completed and delivered two barges, two are 99% completed, and the remaining barge is 87% completed; and, with respect to the patrol boats, the contractor has completed and delivered four boats, two are over 99% completed, two are about 94% completed, two are over 85% completed, and the remaining two patrol boats are approximately 80% completed.
5. Total losses under the subject contracts are estimated by the Cost Inspector in the sum of $482,786. Bun-out costs for the uncompleted units, as of 1 September 1954, are estimated by the Bureau of Ships m the sum of approximately $77,655, and the run-out balance to be due to the contracor upon completion of the subject contracts is estimated,at approximately $61,954, plus a withholding estimated in the sum of approximately $8,703, thereby resulting in a net run-out loss of approximately $7,000.
6. Financial statements as of 31 May 1954, the latest submitted by the contractor, as adjusted to reflect the losses incurred and to be incurred under the subject contracts, disclose current assets of $200,981; current liabilities of $268,873, or a negative working capital of $67,892; and a net worth deficit of $134,463. The contractor’s profit and loss statement for the eight months ending 31 May 1954 discloses a net profit from commercial operations in the amount of $69,737, or approximately $8700 per month. In addition, it is estimated that trade accounts payable of an urgent nature are presently in the sum of almost $67,000. It would therefore appear that the contractor is faced with an imminent cessation of activities and that its present and potential resources are insufficient to enable completion of the subject contracts.
7. While recognizing that other shipyards are available for completion of the subject contracts, the Bureau has submitted figures which indicate that, even granting an amendment without consideration in the sum of $125,000 as originally recommended by the Bureau, a net saving of approximately $100,000 will nevertheless accrue to the Government. The Bureau has estimated that, if the subject contracts were terminated for default and new contracts placed elsewhere, excess costs would be some $220,000, the recovery of which from the contractor being highly improbable due to its practically insolvent condition. Moreover, if the contractor were *30 enabled to complete the subject contracts, it is anticipated that final deliveries will be completed within two and one-half months.
8. On the basis of the financial and accounting analysis developed above, the Board is of the view that if an amendment without consideration in the sum of $74,000 is made available to the contractor, so as to meet pressing-trade accounts in the sum of $67,000 and to cover the net run-out loss estimated at $7000, together with payment to the contractor of such part of the amounts previously withheld and to be withheld from contractor’s billings as is deemed necessary, the contractor will be afforded sufficient working capital to enable completion of the subject contracts. In this manner the Board finds that the Government will be assured of a net savings of at least $100,000, as asserted by the Bureau, and that the national defense will be thereby facilitated.
9. Accordingly, the Board finds that an amendment without consideration is warranted under the subject contracts, as more fully set forth below.
FINDINGS
Based on all the facts of the case, the Navy Contract Adjustment Board hereby authorizes an amendment without consideration to contracts NObs-3226 and NObs-5606 with Sound Ship Building Corporation in a total sum not to exceed $74,000, and such other amendment to said contracts as is deemed necessary to make available to the contractor such part of the monies presently being withheld and to be withheld under the contracts as will enable the contractor to generate further progress payments in the completion of the subject contracts, said price increase and other monies paid to the contractor hereunder to be administered by means of a controlled account and such other provision as is deemed necessary to effectuate the purposes of the amendments authorized herein; provided, however, that the amendments authorized herein shall contain a provision to the effect that the said amendments shall be of no force and effect in the event the contractor fails to complete the subject contracts in all respects.
The Board finds that the amendments authorized herein, together with the further progress payments available to the contractor under the contract terms, should be adequate to afford sufficient working capital to the contractor so as to enable completion of the subject contracts.
*31 The Board finds that its action in this case will facilitate the national defense.
31. The Adjustment Board’s decision did not divide the $74,000 award between the two contracts; but, according to Navy procedure, the Board’s decision was referred back to the Bureau of Ships for implementation by amendment to the contracts. Under date of September 9,1954, the Bureau filed an endorsement, with supplementary facts and recommendations, with the chairman of the Adjustment Board, recommending that $67,000 of the award be applied to 40 percent of plaintiff’s pressing liabilities, and $7,000 be applied to its run-out losses, i.e., the excess of its actual costs over the balance of contract price payable by way of progress payments; and to divide the $74,000 amount awarded into $64,000 for NObs-3226 and $10,000 for NObs-5606.
32. Under date of September 9,1954, the Bureau of Ships, in accordance with the Adjustment Board’s decision and its own recommendations, issued Amendment No. 10, authorizing the amount of the award, $74,000, to be deposited in a controlled account established by Amendment No. 5 to NObs-3226, but allowing withdrawals therefrom at plaintiff’s option, to settle costs incurred in the performance of NObs-5606. This money was made available to plaintiff on the same day, September 9,1954.
33. On or about September 17,1954, plaintiff wrote to the chairman of the Adjustment Board, advising that the amendment without consideration in the amount of $74,000 was insufficient to permit plaintiff to complete its contracts, that the amount of $74,000 was erroneously computed by the Bureau on the basis of outdated financial information and mistaken assumptions as to the availability to plaintiff of certain sums due under the contract, and requesting a further amendment without consideration in the amount of $82,473.41. Plaintiff furnished to the Adjustment Board further financial information concerning pressing obligations to creditors, aging of accounts payable, notes payable on August 31, 1954, assignments of accounts payable, and working capital requirements.
34. On October 5, 1954, the Adjustment Board increased the amount of Title II relief authorized by its decision of *32 September 8, 1954, by a sum not exceeding $45,000. The basis for this action was stated by the Adjustment Board as follows:
5. By contract amendment No. 10 executed 9 September 1954, the contractor was granted an amendment , without consideration in the amount of $74,000, as authorized by reference (b). As of the date of the hearing, the Bureau had approved, pursuant to the terms of the amendment, payments by the contractor to its trade creditors in the total authorized sum of $67,000. The contractor now contends that it still has a further $40,000 in other accounts payable as of 81 August 1954 which are likewise of an urgent nature. In addition the contractor contends in substance that the $8703 in withholdings from contractor billings, as of 1 September 1954, is insufficient to afford the contractor sufficient working capital so as to be able to commence generating further progress payments under the subject contracts and, inasmuch as the Bureau had originally stated that approximately $30,000 in withholdings was available, a further sum of approximately $21,000 would be required in this regard. While there is some indication that, even without the Board’s authorizing ,any additional monies in this connection, the contractor may nevertheless be able to forestall drastic action by its creditors and also have sufficient monies in order to be able to commence generating further progress payments, there is no assurance that this can in fact be accomplished. On the other hand, the contractor has been unable to demonstrate that the full sum of over $61,000 will be required, as contended above.
6. On the basis of the additional information developed above, the Board finds that a further amendment without consideration to the subject contracts in a total sum not to exceed $45,000, as more fully set forth below, is consistent with the Board’s earlier decision and is warranted in the premises. Upon the basis of the figures previously submitted by the Bureau, the Government will still be assured of a net savings of approximately $100,000 in view of the fact that the contractor would be unable to respond to excess costs if the subject contracts were terminated for default.
SUPPLEMENTAL RINDING
Based on the additional information developed in the contractor’s request for reconsideration herein, the *33 Navy Contract Adjustment Board hereby authorizes a further amendment without consideration to contracts NObs-3226 and NObs-5606 with Sound Ship Building Corporation in a total sum not to exceed $45,000, subject to all the terms and conditions set forth in the Board’s Finding of 8 September 1954 previously issued with respect to the subject contracts.
The Board has authorized the said $45,000 in additional monies so that the same may be applied (i) to offset $21,494.67 in future run-out billings which the contractor had committed to the repayment of monies previously advanced by the bank for current obligations, and (ii) for the payment of other accounts payable of the contractor. In this manner, the contractor should be assured of sufficient working capital to enable completion of the subject contracts, thereby resulting in a substantial net savings to the Government.
The Board finds that the amendments authorized herein are consistent with the rationale adopted in the Board’s earlier decision.
The Board finds that its action in this case will facilitate the national defense.
35. Plaintiff’s contract contained the following clause:
By Letter dated 30 June 1952 an award of Contract NObs-3226 was made in anticipation of the execution of this contract. This contract supersedes such Letter and constitutes the entire agreement between the parties.
Amendment No. 10 to the contract, dated September 9, 1954, amending the contract without consideration to increase the contract price by $74,000, stated that “except as modified herein, all terms and conditions of Contract NObs-3226, as amended, shall remain in full force and effect.”
On October 28,1954, plaintiff’s contract was duly amended by Amendment No. 14 in accordance with the authorization of the Adjustment Board of October 5, 1954, increasing the contract price by $45,000.
36. The record does not establish that the Adjustment Board acted upon any alleged representation made by the plaintiff on or about May 31,1954, to the effect that plaintiff did not have and would not have in the future any further claims for additional costs under the contract, when granting increases in the contract price without consideration.
*34 (a) Plaintiff informed defendant on May 21, May 31, and June 7,1954, that plaintiff had and would have in the future claims for additional costs under the contract.
(b) In. its statement of facts and recommendation of August 18, 1954, the Bureau brought to the Adjustment Board’s attention plaintiff’s letter of May 31, 1954, in which plaintiff stated: “Official change orders still to be adjudicated, and requested change orders will, if granted, reduce this figure by perhaps $85,000.00.”
(c) In its statement of facts and recommendations dated August 18,1954, the Bureau informed the Adjustment Board that between May 31, 1954, and July 15, 1954, the price of plaintiff’s contracts was increased by approximately $20,000 as a result of adjudications of official change orders awaiting adjudication on May 31. The Bureau stated:
Subsequent to 31 May 1954 the “Remaining Contract Prices” were further increased by the adjudication of outstanding Change Orders. Thus, as of 15 July 1954, the total amount yet to be paid under both contracts was $118,664.
(d) In its supplementary statement of facts and recommendations dated September 7, 1954, the Bureau brought to the attention of the Adjustment Board that plaintiff was entitled to receive subsequent to August 31, 1954, approximately $20,000 for extra work resulting from estimated Government responsible trial items. Substantially all of the extra work resulting from Government trial items had been performed by the plaintiff prior to August 31, 1954. This estimated sum of $20,000 due to plaintiff for extra work was omitted from the Bureau’s supplementary statement of facts and recommendations dated September 9, 1954, and was not taken into consideration by the Bureau or the Adjustment Board in granting Title II relief to plaintiff.
37. Subsequent to May 31, 1954, the Bureau continued to pay plaintiff additional compensation under plaintiff’s contracts for the cost of items of extra work described in requests for change orders pending on May 31, 1954, and in official change orders awaiting adjudication on May 31, 1954, as indicated by the following items:
*35 A. Contract Amendment No. 7, dated June 9,1954, granted plaintiff a price increase of $1,983 for extra work while plaintiff’s Title II application was pending.
B. Change Order No. 105, modification 1, dated June 19, 1954, granted plaintiff a price increase of $9,162 for extra work while plaintiff’s Title II application was pending.
C. Contract Amendment No. 9, dated June 24,1954, granted plaintiff a price increase of $11,649 for extra work, while plaintiff’s Title II application was pending.
D. Contract Amendment No. 11, dated October 19, 1954, granted plaintiff a price increase of $1,656 for extra work, while plaintiff’s Title II application was pending.
E. Contract Amendment No. 12, dated October 19, 1954, granted plaintiff an increase of $2,331.37 for extra work, while plaintiff’s request for Title II reconsideration was pending.
F. Contract Amendment No. 13, dated October 28, 1954, granted plaintiff an increase of $23,162.78 for extra work, after Title II relief was awarded to plaintiff.
38. Plaintiff completed its contract for the construction of twelve patrol boats, and the last patrol boat was delivered to and accepted by the defendant on December 24, 1954. After plaintiff’s completion of the contract, the Bureau executed contract amendment No. 17, dated March 21, 1955, granting plaintiff a price increase of $4,731.41 for extra work.
39. After plaintiff’s completion of the contract, plaintiff continued to press its claim for additional compensation to cover costs of extra work, and the Bureau refused to allow additional compensation to plaintiff. Specific examples concerning this subject include the following:
(a) Plaintiff’s written request for an increase in the contract price dated January 19,1955, was denied by the Bureau on June 24,1955.
(b) Plaintiff’s written requests for increases in the contract price dated February 11, 1955, and March 4,1955, were denied by the Bureau on April 21,1955.
(c) Plaintiff’s written request for an increase in the contract price dated February 17, 1955, was denied by the Bureau on December 9, 1955.
*36 40. No representative of tbe Bureau advised plaintiff in 1954,1955, 1956, or 1957 tbat plaintiff bad informed tbe Bureau on May 31,1954 tbat it neither bad nor would bave in tbe future further claims under tbe contract. The Bureau’s denial of plamtiff’s claims was not predicated on such a basis. Tbe Bureau did not contend until the contracting officer’s decision of March 16,1958, tbat plaintiff was not entitled to compensation for cost of extra work performed at tbe direction of tbe Bureau because of the alleged representation made by plaintiff to the Bureau on May 31, 1954.
41. Almost a year and a half after contract NObs-3226, as amended, and payments thereunder were completed, plaintiff filed with the Bureau of Ships a “Consolidated Claim of Sound Ship Building Corp.” under contract NObs-3226 (with later amplifications by letter), in which plamtiff requested change orders to cover a considerable number of items of additional work done and additional costs alleged to have arisen during the performance of the contract nearly two years before. Plaintiff listed its requests for change orders in this claim as follows:
A. Transoms_ $18, 668. 61
B. Engine Koom Blowers_ 2, 843.50
0. “As Constructed” Drawings_ 7,292.62
D. Engraved Labels_ 3,927.66
E. Four Minor Items_ 2, 944. 79
E. Exhaust System- 2,466. 96
G. Electrical_ 18,470.32
JET. Inadequacies of Contract Plans- 41,124.66
I. Clerical_ 1,293.26
J. Change of Standards_ 99,573.69
Total_ 198,606.57
42.As to the claim for the “cost” of the as-constructed drawings, which is item 3 of the consolidated claim and Count II of the petition, the contracting officer denied the same for the following reasons:
No additional work beyond contract requirements was performed by the Contractor in the preparation of “as-constructed” drawings.
(a) Contract NObs-3226 required the Contractor to construct the boats to be delivered under the contract in accordance with Interim Military Specification MIL- *37 B-11790 (entitled “Boat, Patrol, Diesel, Wood, 63 Ft., Design 4002” and hereinafter sometimes referred to as the “basic specification”.) Paragraph 2.1 of MIL-B-11790 stated that it incorporated Specification MIL-D-11464 (entitled “Drawings and Technical Data for Transportation Corps Equipment”). Paragraph 1.1 of MIL-D-11464, setting forth its general scope, indicated that MIL-D-11464 dealt with the preparation and approval of certain types of data which it was the Contractor’s duty to furnish to the Government. Among them was listed “as-constructed” data. Paragraphs 3.3 and 3.3.1 of MIL-D-11464 set forth more explicitly the duty of the Contractor to furnish “as-constructed” data, including “as-constructed” drawings. ■
(b) Further, paragraph 3.1.1 of MIL-B-11790 stated that certain specified data and “other technical data” were to be prepared and submitted for approval in conformance with MIL-D-11464. The use of the general term “other technical data” shows that all the requirements of MIL-D-11464 (except those patently inapplicable) were to be followed, not merely selected portions of those requirements. The appropriate sections of MIL-D-11464 requiring the Contractor to furnish “as-constructed” drawings are cited in subsection (a) above.
43. Of the items making up total costs of $62,009.30 (listed in finding 9 above) for which the contracting officer decided there should be no change orders, they are described in the consolidated claim as follows:
A. Reinforcement of Transoms. — Under date of December 8, 1962, plaintiff transmitted “suggested reinforcement to the transom” of the patrol boat design, stating that “no additional charge will apply for the reinforcement indicated”. No request for a change order for the cost was made until January 17,1956. In his reply to Mr. Lucisano’s inquiry on June 7,1954, of what the $85,000 of change orders and requests therefor consisted, Starr did not mention transoms.
B. Engine Room Blowers. — Under date of September 2, 1953, plaintiff requested relocation and substitution of engine room blowers. Under date of September 16, 1953, the Supervisor of Shipbuilding authorized this, but stated the understanding that it “will involve no increased cost.” Under date of September 22, 1953, plaintiff stated its belief *38 that “an increased cost is, in fact, involved,” and requested a change order “in accordance with which he will prepare his estimate for adjudication.” No change order was issued and plaintiff made no estimate and filed no claim for cost until January 19, 1955. In his reply to Lucisano’s inquiry of June 7, 1954, of what the $85,000 of change orders and requests therefor consisted, Starr did not mention engine room blowers.
C. As-0(instructed Drawings. — Under date of September 17, 1953, plaintiff sent a memorandum to Bureau of Ships requesting a ruling as to whether the furnishing of accurate plans for the construction of the twelve vessels was work beyond the scope of the contract for which plaintiff could be allowed extra compensation. In reply to this request, Bureau of Ships sent plaintiff a memorandum stating:
As the contract plans formed a part of the Invitation to Bid and were supposedly reviewed by the contractor prior to contract award any deficiencies, in those plans should have been apparent to the contractor at that time. Further, any design costs resulting from the alleged plan deficiencies, the correction of which were necessary to fulfill the “as constructed” plan requirements, should have been contemplated by the contractor. Accordingly the Bureau considers the subject design work is entirely within the scope of the contract.
Under date of May 6, 1954, plaintiff, referring to Bureau of Ships’ reply of March 16,1954, that such work was within the scope of the contract, sent (via New York Supervisor of Shipbuilding) the Bureau of Ships a memorandum interpreting the contract and the specifications otherwise, and referred to the plans as “as constructed” drawings. It was not until June 7, 1954, a week after applying for Title II relief, that plaintiff submitted to the contracting officer its costs for the as-constructed drawings, consisting of fees paid an electrical engineer for designs, and 1,350 drafting hours at $5 an hour with overall profit of 8.2 percent, totaling $11,664.01. On July 15,1954, Bureau of Ships, by memorandum to the New York Supervisor of Shipbuilding referring to the applicable specifications, disapproved of the issuance of a change order to cover increased cost of as-constructed drawings, and under date of July 23, 1954, the Supervisor of Shipbuilding em *39 bodied this decision in a memorandum to plaintiff. Under date of October 22,1954, plaintiff requested of the Supervisor of Shipbuilding approval of the as-constructed drawings for five of the vessels, but submitted no costs thereof. Under date of December 15, 1954, the Supervisor of Shipbuilding advised plaintiff that the responsibility for the preparation and furnishing of the as-constructed drawings was plaintiff’s, and reiterated the Bureau of Ships’ denial of plaintiff’s request for change order for costs thereof. After June 7,1954, nothing further was heard from plaintiff with respect to as-constructed drawings costs until its consolidated claim of May 1956. As-constructed data were to be delivered by plaintiff to the contracting officer.
D. Engraved Labels. — This is included in neither plaintiff’s claim nor the contracting officer’s findings of additional work and costs.
E. Four Minor Items. — (1) Weatherstripping of pilot house doors; (2) furnishing watertight scuttles; (3) installing machinery guards; (4) installation of electric tachometers. These are listed in the contracting officer’s findings as 5A, 5B, 5C, and 5D. No request for a change order of the foregoing was made by plaintiff until February 11,1955. In his reply to Lucisano’s inquiries of what the $85,000 of change orders and requests therefor consisted, Starr did not mention any of the foregoing four “minor items.”
F. Exhaust System. — No request for change order for the installation of 6" exhaust line, in place of the 5" exhaust line contracted for, was made by plaintiff until March 4, 1955. This is listed in the contracting officer’s findings as 6 — Exhaust Lines. In his reply to Lucisano’s inquiry of June 7, 1954, of what the $85,000 of change orders and requests therefor consisted, Starr did not mention any change in the 5" exhaust line.
G. Electrical. — No request for a change order to clarify and correct the electrical designs and the installations thereunder was made by plaintiff’s requesting an increase in contract price of $18,470.82 until March 4,1955. In his reply to Lucisano’s inquiry of June 7,1954, Starr did not mention electrical designs and installations. In his findings, the contracting officer divided the electrical claim into four items: *40 YA, YB, YC, and YD. However, YC is not listed in the contracting officer’s findings of additional work and costs, and is not included in plaintiff’s claim.
H. Design and Development. — No request for change order increasing the contract price by $41,124.66 to cover contract plans, bills for materials, and redrafting of drawings of vessels was made by plaintiff until July 21,1955. The contracting officer in his findings described this claim as “Plan Discrepancies and Inadequacies,” dividing the same into groups I, II, and III, and listed the same as Item 8.
• I. Clerical. — On April 15,1954, plaintiff made request for a change order for extra work preparing inventories, shortage lists, repair parts list, and copies thereof, in the amount of $1,195.25 with an 8.2 percent profit totaling $1,293.96. This is listed in the contracting officer’s findings at 9 — Clerical Work.
J. Change of Standards. — The contracting officer in his findings divided this claim into thirteen alphabetically-lettered claims, 10A to 10M, finding additional work and additional cost for all except 10A, B, D, and F, totaling $20,0Y5.38 of costs. But no request for change order covering any of the items under “Change of Standards” was made by plaintiff until September 15, 1955. In his reply to Lucisano’s inquiry of June Y, 1954, Starr did not mention any of the items of change of standards particularly described in plaintiff’s consolidated claim and listed in the contracting officer’s findings 10 Ato 10M.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of fifty-nine thousand, four hundred and three dollars, and one cent ($59,403.01).

 We have examined and overruled the defendant’s exceptions to the Commissioner’s report. At the oral argument, the plaintiff withdrew its exceptions which it characterized as minor.

 Act of December 18, 1941, Sec. 201, 55 Stat. 839, as amended by tie Act of Jan. 12, 1951, 64 Stat. 1257, 50 U.S.C. § 611; Executive Order No. 9001, 6 Feb. Reg. 6787. See Fogarty v. United States, 340 U.S. 8, 11; 40 Op. Atty. Gen. 225; Fain and Watt, War Procurement—A New Pattern for Contracts, 44 Col. L. Rev. 127, 194-206 (1944); Kramer, Extraordinary Relief for War Contractors, 93 U. of Pa. L. Rev. 357 (1945).

 Late in August 1954, the plaintiff submitted further data on the status of its trade accounts. On June 30, 1954, plaintiff had supplied supplementary information relating to its balance sheet and financial statements.

 Some of these had previously been presented in one form or another, and some had not been. Except for the estoppel defense now raised by the Government, there was no barrier to the presentation of any of these claims in 1956. This was a considerable period after the completion of the work, but the contract, as actually administered, did not preclude the contractor from filing its formal consolidated claims at that time. The contracting officer did not reject the claims as untimely presented.

 On the latter Item, the Board of Contact Appeals found the extra cost to be $7,292.62, and plaintiff sued for that amount in its petition in this court. The Commissioner has found the cost to be slightly higher, l.e., $7,393.71 (finding 14), and plaintiff asks for that sum in its briefs. We treat the petition as amended accordingly (see Eule 18(b)).

 It also appears that at Its preliminary conference rvlth the Bureau, in May 1954, on its financing problems — before the filing of its formal application for relief — plaintiff indicated that further requests for change orders might be filed. See finding 16 (par. 8 of Harrison’s memorandum of May 24, 1954). At that time the Bureau representative (Harrison) made his own evaluation that no substantial amounts would be due under change orders.

 This finding is considered to be supported by the preponderance of the evidence, although the testimony of Lucisano and Starr is, to some extent, in disagreement.